**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT GLICK, Individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>ARQIT QUANTUM INC. F/K/A CENTRICUS ACQUISITION CORP., DAVID WILLIAMS, NICK POINTON, CARLO CALABRIA, STEPHEN CHANDLER, MANFREDI LEFEBVRE D'OVIDIO, VERALINN JAMIESON, GARTH RITCHIE, AND STEPHEN WILSON,<br><br>　　　Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Robert Glick ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and

1

regarding Arqit Quantum Inc. ("Arqit" or the "Company") f/k/a Centricus Acquisition Corp. ("Centricus"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of: (i) all persons or entities who purchased or otherwise acquired Arqit securities between September 7, 2021 and April 18, 2022, inclusive (the "Class Period"); and/or (ii)  all holders of Centricus securities as of the record date for the special meeting of shareholders held on August 31, 2021 to consider approval of the merger between Arqit and Centricus (the "Merger") and entitled to vote on the Merger (the "Class"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5, 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Arqit securities during the Class Period and was economically damaged thereby.

7.      Defendant Arqit is purportedly a cybersecurity company that has pioneered a unique quantum encryption technology. Arqit is incorporated in the Cayman Islands and its headquarters are located at 3 More London Riverside 1st Floor London X0 SE1 2RE. Arqit's common shares trade on the NASDAQ ("NASDAQ") under the ticker symbol "ARQQ." Prior to the Merger, Arqit was known as Arqit Limited.

8.      Centricus was a special purpose acquisition corporation ("SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. Prior to the Merger, Centricus shares traded on the NASDAQ under the ticker symbol "CENHU."

9.      Defendant David Williams ("Williams") served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board after the Merger and at all relevant times thereafter. Defendant Williams is also the founder of Arqit Limited.

10.     Defendant Nick Pointon ("Pointon") served as the Company's Chief Financial Officer after the Merger and at all relevant times thereafter.

11.     Defendant Carlo Calabria ("Calabria") served as a director of Arqit after the Merger and at all relevant times thereafter.

12.     Defendant Stephen Chandler, ("Chandler") served as a director of Arqit after the Merger and at all relevant times thereafter.

13.     Defendant Manfredi Lefebvre D'ovidio, ("D'ovidio") served as a director of Arqit after the Merger and at all relevant times thereafter. Defendant D'ovidio was also the owner and Chairman of the Board of Centricus at the time of the Merger.

14.     Defendant VeraLinn Jamieson ("Jamieson") served as a director of Arqit after the Merger and at all relevant times thereafter.

15.     Defendant Garth Ritchie ("Ritchie") served as a director of Arqit after the Merger and at all relevant times thereafter. Defendant Ritchie was also the CEO of Centricus at the time of the Merger.

16.     Defendant Stephen Wilson ("Wilson") served as a director of Arqit after the Merger and at all relevant times thereafter.

17.     Defendants Williams, Pointon, Calabria, Chandler, D'ovidio, Jamieson, Ritchie, and Wilson are collectively referred to herein as the "Individual Defendants."

18.     Each of the Individual Defendants:

     (a)     directly participated in the management of the Company;

     (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

     (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

     (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

     (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

19.     Arqit is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Arqit under *respondeat superior* and agency principles.

21.     Defendants Arqit and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

22.     Centricus was a special purpose acquisition corporation ("SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

23.     Defendant Arqit is purportedly a cybersecurity company that has pioneered a unique quantum encryption technology. Arqit alleged its quantum encryption technology would be secure against current and future forms of cyberattacks, including from a quantum computer.

### Materially False and Misleading Statements and Omissions Issued in the
### Proxy Statement for the Merger

24.     On May 28, 2021, Arqit filed with the SEC a Form F-4 Merger Proposal Registration (the "Proxy Statement") for the Merger.

25.     On July 30, 2021, Arqit filed with the SEC a prospectus (the "Prospectus") for the

Merger, which forms part of the Proxy Statement.

26.     The Proxy Statement stated the following regarding Arqit's unique quantum encryption technology:

> Arqit is a cybersecurity company that has pioneered a unique quantum encryption technology which makes the communications links of any networked device *secure against current and future forms of cyber attack — even an attack from a quantum computer.* Arqit's product, called QuantumCloud™, creates *unbreakable software encryption keys that are low cost and easy to use with no new hardware required. The software has universal application to every edge device and cloud machine in the world.* Arqit has not only invented a ground-breaking new quantum protocol, but it has also found a way to translate the benefits of quantum security to end point devices.
>
> Arqit's solution combines world-leading innovation in two areas: a new form of quantum satellite and a software agent that can be downloaded onto any device. *Arqit's quantum satellite technology solves all previously known problems of quantum key distribution* and puts identical copies of quantum safe keys into each data center in a network. The data centers use these keys to create secure channels between them — an outer perimeter of quantum safety that Arqit calls the QuantumCloud™. A second innovation is a small software agent downloaded from the QuantumCloud™ onto any form of device or integrated into any piece of software. By exchanging information with the QuantumCloud™, which moderates a key agreement process with all parties involved in a unique way, this software agent is able to create new symmetric encryption keys in partnership with any other device or cloud machine, or in large groups of devices. Keys are never "delivered", they are created, and so they cannot be intercepted. They are created at the end points in a manner that means they can never be known by a third party, and can be used only once if necessary and replaced infinitely. The service is sold and fulfilled on a self-service basis in the cloud making it an easily scalable business model.
>
> (Emphasis added.)

27.     The Proxy Statement also contained a Risk Factors section. However, the Risk Factors failed to discuss the risks to Arqit surrounding the adoption of new communications technologies necessary for Arqit's encryption technology – namely, that Arqit needed the widespread adoption new protocols and standards for telecommunications, cloud computing, and internet services that currently were not supported.

28.     In addition, the Proxy Statement made the following representations regarding Arqit's future business prospects:

> To date, Arqit has been a development stage company, however it is currently preparing to launch its first live service during the second half of 2021. **Arqit has already signed major, long-term contracts for its services with large companies and government institutions.** Its next step in commercialization will be to undertake pilot phases that are required to be completed with each of its customers. Prior to launch of its satellites, Arqit's quantum encryption platform, QuantumCloud™, will use machines in data centers to generate a terrestrial simulation of the quantum satellite technology. By 2023, it plans to launch its first two quantum satellites, which will generate a significant increase in the level of security offered by the end-to-end system.
>
> Arqit's current customers include the UK Government, the European Space Agency, BT plc, and Sumitomo Corporation. Many companies like Verizon, BP, NEOM, Juniper, Dentons, Northrup Grumman and Iridium have contracted to test the use of Arqit's technologies in different use cases.
>
> (Emphasis added.)

29.     The Proxy Statement issued in connection with the merger was materially false and misleading and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These materially false and misleading statements and omissions remained alive and uncorrected during the Class Period.

### Materially False and Misleading
### Statements Issued During the Class Period

30.     The Class Period begins on September 7, 2021, the first day Arqit shares began trading on the NASDAQ pursuant to the Merger under the ticker symbol "ARQQ". Prior thereto, on May 28, 2021 and July 30, 2021, Arqit issued the Proxy Statement, as amended, that contained materially false and misleading statements and omissions about the scalability of Arqit's product given modern telecommunications protocols and infrastructure, its future business prospects, and relevant risk factors affecting Arqit.

31.     On September 10, 2021, the Company filed its annual/transition report on Form 20-F with the SEC (the "September 2021 20-F"). The September 2021 20-F incorporated the Risk Factors section of the Proxy Statement by reference, but did not provide additional risk factors Arqit faced, such as the need for widespread adoption of new telecommunications protocols and infrastructure.

32.     The September 2021 20-F also incorporated by reference the false and/or misleading statements about Arqit's encryption technology in the Proxy Statement, as discussed previously in ¶26.

33.     The September 2021 20-F additionally incorporated by reference the false and misleading statements about Arqit's future business prospects in the Proxy Statement, as discussed previously in ¶28.

34.     On December 16, 2021, the Company filed another annual/transition report on Form 20-F with the SEC (the "December 2021 20-F"). The December 2021 20-F stated the following regarding Arqit's encryption technology and business prospects:

> ***Arqit is a cybersecurity company that has pioneered a unique quantum encryption technology which makes the communications links of any networked device secure against current and future forms of cyber attack — even an attack from a quantum computer. Arqit's product, called QuantumCloud™, creates unbreakable software encryption keys*** that are low cost and easy to use with no new hardware required. ***The software has universal application to every edge device and cloud machine in the world.*** Arqit has not only invented a ground-breaking new quantum protocol, but it has also found a way to translate the benefits of quantum security to end point devices.

> Arqit's solution combines world-leading innovation in two areas: a new form of quantum satellite and a software agent that can be downloaded onto any device. ***Arqit's quantum satellite technology solves all previously known problems of quantum key distribution and puts identical copies of quantum safe keys into each data center in a network.*** The data centers use these keys to create secure channels between them — an outer perimeter of quantum safety that Arqit calls the QuantumCloud™. A second innovation is a small software agent downloaded from the QuantumCloud™ onto any form of device or integrated into any piece of software. By exchanging information with the QuantumCloud™, which

moderates a key agreement process with all parties involved in a unique way, this software agent is able to create new symmetric encryption keys in partnership with any other device or cloud machine, or in large groups of devices. Keys are never "delivered", they are created, and so they cannot be intercepted. They are created at the end points in a manner that means they can never be known by a third party, and can be used only once if necessary and replaced infinitely. The service is sold and fulfilled on a self-service basis in the cloud making it an easily scalable business model.

Until recently, Arqit has been a development stage company, however ***during the fiscal year ended September 30, 2021, it began commercializing its products. Arqit has already signed major, long-term contracts for its services with large companies and government institutions***, and is in the process of undertaking pilot phases that are required to be completed with each of its customers. Prior to launch of its satellites, Arqit's quantum encryption platform, QuantumCloud™, will use machines in data centers to generate a terrestrial simulation of the quantum satellite technology. By 2023, it plans to launch its first two quantum satellites, which will generate a significant increase in the level of security offered by the end-to-end system.

***Arqit's current customers include the UK Government, the European Space Agency, BT plc, and Sumitomo Corporation.*** Many companies like Verizon, BP, NEOM, Juniper, Dentons, Northrup Grumman and Iridium have contracted to test the use of Arqit's technologies in different use cases.

(Emphasis added.)

35.    The December 2021 20-F also contained a Risk Factors section. However, the Risk Factors failed to discuss the risks to Arqit surrounding the adoption of new communications technologies necessary for Arqit's encryption technology – namely, that Arqit needed the widespread adoption new protocols and standards for telecommunications, cloud computing, and internet services that currently were not supported.

36.    The statements contained in ¶¶24-35 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Arqit's proposed encryption technology would require widespread adoption of new protocols and standards of for telecommunications; (2) British cybersecurity

officials questioned the viability of Arqit's proposed encryption technology in a meeting in 2020; (3) the British government was not an Arqit customer but, rather, providing grants to Arqit; (4) Arqit had little more than an early-stage prototype of its encryption system at the time of the Merger; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

37.     On April 18, 2022, *The Wall Street Journal* (the "WSJ") published an article titled, "British Encryption Startup Arqit Overstates Its Prospects, Former Staff and Others Say." The WSJ article stated, in relevant part:

> ***When the company secured its Nasdaq listing last autumn, its revenue consisted of a handful of government grants and small research contracts, and its signature product was an early-stage prototype unable to encrypt anything in practical use***, according to [former employees and other people familiar with the company]. ***The encryption technology the company hinges on***—a system to protect against next-generation quantum computers—***might never apply beyond niche uses, numerous people inside and outside the company warned, unless there were a major overhaul of internet protocols.***
>
> \*       \*       \*
>
> ***British cybersecurity officials questioned the viability of Arqit's proposed approach to encryption technology*** in a high-level evaluation they privately shared with the company in the summer of 2020, according to people familiar with the matter.
>
> \*       \*       \*
>
> ***The U.S. National Security Agency and the NCSC published separate assessments in recent years warning against using satellite-based encryption systems like those Arqit is proposing*** to integrate into its current product in the next few years. The NSA said its warning was unrelated to any specific vendor, a spokesperson said.
>
> \*       \*       \*

*The encryption system—with or without its satellite components—depends on the broad adoption of new protocols and standards for telecommunications, cloud computing and internet services that currently aren't widely supported*, people familiar with the matter said.

Steve Weis, a San Francisco-based cryptographer and entrepreneur, said that *what Arqit was proposing—relying in part on transmitting quantum information from satellites—is a well-known 1980s-era technology with limited real-world application.* "There have been many proofs of concept and companies trying to sell products," he said. *"The issue is that there is no practical-use case."*

*   *   *

Key to the company's pitch was its claim that it had a large stream of future revenue locked in as the product was live and already selling well. "Customers are using the Arqit products today—and they are universally finding it to be an important part of their technology future," Mr. Williams said in an August investor presentation shortly before the merger closed. He added, "The Quantum Cloud product is live for service and we already have $130 million in signed committed revenue contracts."

"These are contracts where the revenues will definitely be delivered," the CEO said.

*The people familiar with the matter said that the bulk of the company's committed revenue isn't from selling its product and that at its public launch, the company had little more than an early-stage prototype of its encryption system. Several clients the company lists—including a number of British government agencies—are simply giving Arqit research grants, nonbinding memorandums of understanding or research agreements that come with no funding, not contracts for its encryption product, they said.*

No commercial customer was using Arqit's encryption system with live data when it made its market debut in September, the people said, and the system couldn't meaningfully use any of the common internet protocols required to do nearly anything online. They said it has signed two master distribution agreements with BT Group [] PLC and Sumitomo Corp. [] for the still-unrealized satellite component of its technology that are cancelable under certain conditions.

(Emphasis added.)

38.    On this news, Arqit share price fell $2.57 per share, or 17%, to close at $12.49 per share on April 18, 2022, damaging investors.

39.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Arqit securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Arqit, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Arqit securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of Arqit;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Arqit to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Arqit securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Arqit securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, Arqit filed periodic public reports;

- Arqit regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Arqit's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Arqit was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

47.     Based on the foregoing, the market for Arqit securities promptly digested current information regarding Arqit from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

14

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Arqit securities during the Class Period.

53.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Arqit were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

These defendants by virtue of their receipt of information reflecting the true facts of Arqit, their control over, and/or receipt and/or modification of Arqit's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Arqit, participated in the fraudulent scheme alleged herein.

54.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Arqit personnel to members of the investing public, including Plaintiff and the Class.

55.     As a result of the foregoing, the market price of Arqit securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Arqit securities during the Class Period in purchasing Arqit securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

56.     Had Plaintiff and the other members of the Class been aware that the market price of Arqit securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Arqit securities at the artificially inflated prices that they did, or at all.

57.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

58.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the

Class for substantial damages which they suffered in connection with their purchase of Arqit securities during the Class Period.

**COUNT II**

**Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants**

59.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

60.     This Count does not sound in fraud. Plaintiff does not allege that Defendants had scienter or fraudulent intent with respect to this Count as they are not elements of a Section 14(a) claim.

61.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

62.     Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

63.     By virtue of their positions within Centricus and Arqit and their due diligence regarding the Merger, Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the

Defendants named herein. The Proxy misrepresented and/or omitted material facts, as detailed above. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

64.     As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Proxy was an essential link in the consummation of the Merger. The Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

65.     As a direct result of the Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the Class were precluded from exercising their right to seek redemption of their Centricus shares prior to the Merger on a fully informed basis and were induced to vote their shares and accept inadequate consideration in connection with the Merger. The false and misleading Proxy used to obtain shareholder approval of the Merger deprived Plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Centricus shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning the true value of Arqit, which was far below the operational assets that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy that Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

66.     The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

67.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Arqit, and conducted and participated, directly and indirectly, in the conduct of Arqit's business affairs. Because of their senior positions, they knew the adverse non-public information about Arqit's misstatement of revenue and profit and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Arqit's financial condition and results of operations, and to correct promptly any public statements issued by Arqit which had become materially false or misleading.

71.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Arqit disseminated in the marketplace during the Class Period concerning Arqit's results of operations. Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause Arqit to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Arqit within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Arqit securities.

72.      By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arqit.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)      declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)      awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 6, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       lrosen@rosenlegal.com

*Counsel for Plaintiff*