UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE: ARQIT QUANTUM INC. SECURITIES LITIGATION[1]

**MEMORANDUM & ORDER**
22-CV-2604 (PKC) (MMH)

-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiffs[2] bring this putative class action lawsuit against Defendants, alleging violations of (1) Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; (2) Sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*; and (3) Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated under Section 10(b) of the Exchange Act, 17 C.F.R. § 240.10b-5, and SEC Rule 14a-9 promulgated under Section 14(a) of the Exchange Act, 17 C.F.R. § 240.14a-9.

Plaintiffs seek damages for what they allege were misstatements and omissions made by Defendants during the Class Period regarding the purported functionality of certain data encryption technology developed and sold by Defendants. Defendants now move to dismiss Plaintiffs' suit. For the reasons explained below, Defendants' motion to dismiss is denied in its entirety.

---

[1] This litigation was originally brought as *Glick v. Arqit Quantum Inc.* but was recaptioned when the Consolidated Class Action Complaint ("Consolidated Complaint") was filed. The Clerk of Court is directed to change the case caption on the docket to *In Re: Arqit Quantum Inc. Securities Litigation*. (*See* Consolidated Class Action Compl. ("Cons. Compl."), Dkt. 43, at 1.)

[2] Due to the number of parties in this case, the Court defines the terms "Plaintiffs," "Defendants," and "Class Period." *See infra* in Background § II.

## BACKGROUND[3]

## I. Factual Allegations

### A. The Merger

Special purpose acquisition companies ("SPACs") "are shell companies organized and managed by a sponsor for the purpose of merging with" a private target company. 89 Fed. Reg. 14158, 14160 (Feb. 26, 2024) (entitled "Special Purpose Acquisition Companies, Shell Companies, and Projections") (codified at 17 C.F.R. pt. 210–39). Prior to merger, the SPAC is publicly listed by going through the typical initial public offering ("IPO") process. (Cons. Compl., Dkt. 43, ¶¶ 164–65.) After identifying a private target company, the SPAC and the target company merge via a "de-SPAC" transaction, which "is a hybrid transaction that contains elements of both an [IPO] and a merger and acquisition ('M&A') transaction." 89 Fed. Reg. at 14160. Practically speaking, the de-SPAC transaction is "the functional equivalent of the private target company's IPO." *Id.* Typically, before the de-SPAC transaction closes, shareholders of the SPAC may choose to either redeem their SPAC shares for cash or, instead, to "remain a shareholder of the surviving company." *Id.* at 14160–61. After the merger, the SPAC is transformed from "a shell company with no meaningful operations into a company that carrie[s] on [the target company]'s business." *In re Danimer Sci., Inc. Sec. Litig.*, Nos. 21-CV-2708 & 21-CV-2824 (HG), 2023 WL 6385642, at *1 (E.D.N.Y. Sept. 30, 2023), *aff'd sub nom. Swanson v. Danimer Sci., Inc.*, No. 23-CV-7674, 2024 WL 4315109 (2d Cir. Sept. 27, 2024) (summary order). And shareholders who do not elect to redeem their SPAC shares "go from owning shares in a shell company to

[3] For purposes of this Memorandum & Order, the Court assumes the truth of Plaintiffs' non-conclusory, factual allegations in the Consolidated Complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

owning shares in a combined company that conducts the business of the private target" company. 89 Fed. Reg. at 14160.

The disputes in this case stem from statements related to corporations that merged in a de-SPAC transaction. Centricus Acquisition Corp. ("Centricus") was a SPAC with "no business operations of its own" that was incorporated in November 2020. (Cons. Compl., Dkt. 43, ¶¶ 1, 161–62.) Its NASDAQ IPO began on February 4, 2021, and ended on February 8, 2021. (*Id.* ¶ 170.) During the IPO, Centricus sold "units," each of which was made up of "one Centricus Class A ordinary share and one-fourth of one Centricus warrant."[4] (*Id.*) On March 29, 2021, Centricus securities began trading separately on the NASDAQ, meaning that its Class A ordinary shares traded under one ticker symbol and its warrants traded under a second. (*Id.* ¶ 171.)

On May 12, 2021, Centricus and a second corporation, Arqit Limited, announced their intent to merge—but Centricus ultimately merged with a third corporation, Defendant Arqit Quantum Inc. ("Arqit Quantum" or "Arqit"), which then was newly formed. (*Id.* ¶ 172–73.) The merger took place on September 2, 2021 ("the Merger") and resulted in the following corporate transformations: (1) Arqit Limited became publicly listed; (2) Arqit Quantum acquired Arqit Limited (after which Arqit Limited became Arqit Quantum's subsidiary company); and (3) Centricus merged into and with Arqit Quantum (after which Centricus was no longer). (*Id.* ¶¶ 172–73, 185.)

The Merger had varying effects on different shareholders. Holders of Centricus shares from its IPO "who did not elect to redeem their Centricus ordinary shares" for cash then became "holders of Arqit Quantum securities," each receiving "one Arqit ordinary share and one Arqit

---

[4] A securities "warrant" is "[a]n instrument granting the holder a long-term ([usually] a five- to ten-year) option to buy shares at a fixed price." *Warrant*, Black's Law Dictionary (12th ed. 2024).

warrant for each ordinary share and warrant they [respectively] held in Centricus." (*Id.* ¶¶ 173, 185.) September 3, 2021, was the last day Centricus securities traded on the NASDAQ. (*Id.* ¶ 186.) That same day, Arqit Quantum acquired all "issued and outstanding shares of Arqit Limited from Arqit Limited shareholders"[5] in exchange for a set number of ordinary shares of Arqit Quantum. (*Id.*) Arqit Quantum securities then began trading on the NASDAQ on September 7, 2021. (*Id.* ¶ 187.)

### B. Arqit's Business

Arqit Quantum develops and sells satellite-based quantum key distribution ("QKD") technology, which relates to data encryption. "Encryption is a cryptographic method in which a computer algorithm converts data into secret code, which obscures the true meaning of the information and requires the use of an 'encryption key,' or simply a 'key[,]' to unlock its meaning, just as [a physical] key might be used to lock or unlock a safe and reveal its contents." (Cons. Compl., Dkt. 43, ¶ 64.) Encryption is used to protect sensitive data, such as those collected by government agencies and healthcare and financial institutions, "from hackers and other malicious actors so they cannot read the information without either (a) having the key to decrypt the data, or (b) using brute force—i.e., using a computer to exhaustively generate and try encryption keys until they guess the key." (*Id.*) Quantum computers are newly emerging computers that use more sophisticated algorithms and "can theoretically be used to solve extraordinarily complex problems that traditional computing devices—including large, powerful supercomputers—cannot solve." (*Id.* ¶ 65.) If quantum computers become able to decrypt traditional encryption methods, "it could have devastating consequences for militaries, governments, and businesses across the world [that] rely on such technology to keep their data secure." (*Id.* ¶ 69.) Thus, "as of the time of the [Merger

[5] The Consolidated Complaint does not specify when Arqit Limited shares were issued.

and] Offering[6] [in September 2021], there was a growing fear of the 'quantum threat' that quantum computers posed to traditional encryption methods," which "intensified the need for a 'quantum-resistant encryption' solution as a countermeasure to make devices 'quantum safe'—i.e., able to resist attacks from quantum computers." (*Id.* ¶ 68.)

Once encryption keys exist, "for two users to communicate and exchange [encrypted] data . . . , they ***both*** must have the encryption key. (*Id.* ¶ 84 (emphasis in original).) Distributing keys, then, is another problem "in the cybersecurity industry because while 'computationally secure' symmetric keys[7] can be created," they "cannot be securely transmitted over the world wide web, for example, because the internet is prone to interception and hacking." (*Id.*) "As a result, organizations in the defense, financial services, and national infrastructure sectors have traditionally had to resort to physically transporting encryption keys to avoid the risk of them being intercepted." (*Id.*) "One method of QKD is through the use of fiber optics," though "the physical length of the fiber" presents "significant limitations" that makes this method "impractical for large scale adoption." (*Id.* ¶ 85.[8]) Another method of QKD uses satellites, but this method also has "known problems" or "implementation flaws." (*Id.* ¶¶ 85–86.) For example, a satellite that "remembers the key during transit between [two key users] . . . could be attacked in transit and the key could be copied." (*Id.* ¶ 86.) This flaw is known as the "Decoy State Protocol." (*Id.*) Even where the satellite does not "need to remember the key" (thereby making "intercept[ion] in transit"

[6] The "Offering" is the September 2, 2021 offering of Arqit Quantum securities in connection with the Merger. (Cons. Compl., Dkt. 43, ¶ 4(c).)

[7] "A symmetric encryption key . . . is where two parties communicating have an identical random key number that they use to communicate and encrypt and exchange data." (Cons. Compl., Dkt. 43, ¶ 83.)

[8] Unless otherwise indicated, internal citations within the Consolidated Complaint are omitted.

less likely) and instead transmits the key simultaneously to two key users, both key users must "be in direct line of sight of the satellite," which means that they "cannot be further than approximately 700 km from each other" if the satellite is at a low orbit. (*Id.*) This flaw is known as the "Entangled Photon Protocol." (*Id.*) On top of not being able to work globally, the Entangled Photon Protocol "has [an] impractically high loss rate to be of significant utility even in limited geographies." (*Id.*)

In November 2019, Arqit Limited[9] was primarily focused on developing a satellite-based QKD technology product. (*Id.* ¶ 96.) Because "there was no proven secure and cost-efficient quantum-safe" encryption technology at the time of Merger and Offering in September 2021, Arqit Quantum wanted "to be the first to market with a 'world-leading' quantum-safe encryption product." (*Id.* ¶¶ 4(c), 80.) Arqit Quantum claimed that it had solved "'all known problems' [with satellite-based QKD technology] with its flagship software program, QuantumCloud, and its patented encryption algorithm and quantum protocol ARQ19." (*Id.* ¶ 8.) It "described its QuantumCloud technology as being comprised of two fundamental components: 'a new form of quantum satellite and a software agent.'" (*Id.* ¶ 82.) QuantumCloud's software agent component "purportedly includes both Arqit's patented 'ARQ19' quantum protocol and a quantum encryption algorithm." (*Id.* ¶ 83.) The QuantumCloud software integrates a user's device "into Arqit's QuantumCloud platform," allowing that device to "communicate with Arqit Quantum's QuantumCloud to generate a symmetric encryption key (interchangeably referred to by Arqit as 'quantum keys')." (*Id.*) Arqit claimed that "its technology and innovation through ARQ19 and QuantumCloud 'was a new concept called 'quantum key infrastructure' or 'QKI' whereby the

[9] The Consolidated Complaint does not state when Arqit Limited was incorporated or began operating, but the Court infers that it was in business at least by 2019. (*See, e.g.*, Consol. Compl., Dkt. 43, ¶ 96 (referring to an employee who joined Arqit Limited in November 2019), *id.* ¶ 116 (referring to a July 2019 agreement Arqit Limited entered into with the European Space Agency).)

system does not distribute keys.'" (*Id.* ¶ 89.) "Instead, . . . Arqit's system used [ARQ19] to distribute quantum random numbers in a process known as replicated entropy," and those keys "were then input into Arqit's software." (*Id.*) This software then allowed users to generate encryption keys on their devices, "allow[ing] different end users to communicate and create the same key so that they can communicate securely." (*Id.*) "Thus . . . no encryption key was ever transmitted across any network, and" it was purportedly "not possible for any third party to know or guess the key." (*Id.*)

In mid-2021, Arqit announced that "while it would launch its services" in the second half of 2021 "with terrestrial distribution of quantum random numbers, which would be secure," Arqit would later provide a "quantum satellite version of QuantumCloud," which "would be more secure." (*Id.* ¶ 91.) Multiple industry media and analysts reported on statements by Arqit and its directors regarding its satellite encryption technology. (*Id.* ¶¶ 151–53.) Allegedly, however, "[f]ormer Arqit employees who worked on developing Arqit's satellite and QuantumCloud technology prior to and throughout the Class Period, confirmed that, contrary to [Arqit's statements], neither Arqit's interim QuantumCloud product nor its satellite protocol were commercially viable." (*Id.* ¶ 93.)

In April 2021, before the Merger, "Arqit's Chief Revenue Officer resigned over concerns" that the Arqit Chief Executive Officer ("CEO") "was giving unrealistic revenue projections to potential investors." (*Id.* ¶¶ 31, 156.) Other employees also left over similar concerns, and stated that "at the time of the Offering and throughout the Class Period, Arqit's technology was merely an unproven prototype, making any revenue in the near term unlikely and undermin[ing] Arqit's projected revenue growth." (*Id.* ¶¶ 157–58.) On April 18, 2022, the Wall Street Journal published an article titled "British Encryption Startup Arqit Overstates Its Prospects, Former Staff and Others

Say" (the "WSJ Article"[10]) and "reported that 'according to former employees and other people familiar with the company,' 'Arqit has given investors an overly optimistic view of its future revenue and the readiness and workability of its signature encryption system.'" (*Id.* ¶ 189. *See also* WSJ Article, Dkt. 59-20, at ECF[11] 3.) That day, Arqit Quantum ordinary shares fell 17% in price and Arqit Quantum warrants fell nearly 38% in price. (Consol. Compl., Dkt. 43, ¶ 190.)

On December 14, 2022, Arqit Quantum announced that it was "cooperating with an SEC investigation relating to the business combination between Arqit and Centricus," and that it had "updated its technology strategy to eliminate quantum satellites and the associated ground infrastructure from its core QuantumCloud™ product offering." (*Id.* ¶¶ 200–01.) It also announced that "[i]t has removed, through innovation, the costly and complex satellite component from the tech stack of QuantumCloud™." (*Id.* ¶ 202.) That day, Arqit Quantum ordinary shares fell nearly 18% in price and Arqit Quantum warrants fell almost 35% in price. (*Id.* ¶ 207.)

This litigation followed.

---

[10] The WSJ Article was both cited to in the Consolidated Complaint and attached to Defendants' memorandum of law in support of their motion to dismiss. (Cons. Compl., Dkt. 43, ¶ 12 n.1; Defs.' Ex. Q ("WSJ Article"), Dkt. 59-20.) In determining whether dismissal is warranted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation and citation omitted). Therefore, the Court treats the WSJ Article as incorporated into the Consolidated Complaint.

[11] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

## II. The Parties

Lead Plaintiff Chris Weeks ("Lead Plaintiff Weeks") and named Plaintiffs Patrick Hagemeister, Erwin Jay Lack, and Walter Littlejohn (together, "Plaintiffs") bring this action "individually and on behalf of all other persons similarly situated." (Cons. Compl., Dkt. 43, ¶ 1.) The Section 14(a) Class "consist[s] of all beneficial holders of Centricus securities as of the July 26, 2021 record date for the special meeting of shareholders held on August 31, 2021[,] to consider approval of [the Merger], which resulted in the public listing of Arqit's ordinary shares and warrants on the NASDAQ . . . September 7, 2021." (*Id.* ¶ 4(a).) The Section 10(b) Class "consist[s] of all persons or entities who purchased or otherwise acquired Arqit Quantum securities in connection with the Merger or on a U.S. stock exchange between September 7, 2021, and December 13, 2022, inclusive (the 'Class Period'[12])." (*Id.* ¶ 4(b).) The Section 11 Securities Act Class "consist[s] of all persons or entities who purchased or otherwise acquired Arqit Quantum securities pursuant or traceable to the effective 'Registration Statement' and 'Prospectus' . . . filed with the SEC for [the Offering] in connection with the Merger." (*Id.* ¶ 4(c).) "The Section 10(b) Class and the Section 14(a) Class are referred to herein as the 'Exchange Act Classes,'" and, together with the Securities Act Class, are the "Class" or the "Classes." (*Id.* ¶ 4(d).)

The individuals named as Defendants are:

1. David Williams, co-founder and CEO of Arqit Limited, Chairman of the Board of Directors of Arqit Quantum, and CEO of Arqit Quantum;
2. Nick Pointon, Chief Financial Officer ("CFO") of Arqit Limited from March 2021 through the Merger, CFO and director of Arqit Quantum;
3. Carlo Calabria, director of Arqit Quantum;

[12] The Court notes that while Plaintiffs define the Class Period as between September 7, 2021, and December 13, 2022, Plaintiffs' claims on behalf of the Section 14(a) Class include those who held Centricus securities as of July 26, 2021, (Cons. Compl., Dkt. 43 ¶ 53(b)), and so the Class Period may need to be adjusted.

4. Stephen Chandler, director of Arqit Limited and Arqit Quantum;

5. Manfredi Lefebvre d'Ovidio, Chairman of the Board of Directors of Centricus and director of Arqit Quantum;

6. Lt. General VeraLinn Jamieson (Ret.), director of Arqit Limited and Arqit Quantum;

7. Garth Ritchie, CEO and director of Centricus, and director of Arqit Quantum; and

8. General Stephen Wilson (Ret.), director of Arqit Inc., a subsidiary of Arqit Limited, and director of Arqit Quantum.

(*Id.* ¶¶ 31–38.)

The Consolidated Complaint groups Defendants as follows:

| | |
|---|---|
| "Securities Act Individual Defendants" | Defendants Williams, Pointon, Calabria, Chandler, Lefebvre, Jamieson, Ritchie, and Wilson. (*Id.* ¶ 39.) |
| "Securities Act Defendants" | Defendants Arqit Quantum and the Securities Act Individual Defendants. (*Id.* ¶ 40.) |
| "Section 14(a) Individual Defendants" | Defendants Williams, Pointon, Lefebvre, Ritchie, Jamieson, and Wilson. (*Id.* ¶ 41.) |
| "Section 14(a) Defendants" | Defendants Arqit Quantum and the Section 14(a) Individual Defendants. (*Id.* ¶ 42.) |
| "Section 10(b) Individual Defendants" | Defendants Williams and Pointon. (*Id.* ¶ 43.) |
| "Section 10(b) Defendants" | Defendants Arqit Quantum and the Section 10(b) Individual Defendants. (*Id.* ¶ 44.) |
| "Exchange Act Defendants" | The Section 10(b) Defendants and the Section 14(a) Defendants. (*Id.* ¶ 45.) |

The three groups of individual defendants—the Securities Act Individual Defendants, the Section 14(a) Individual Defendants, and the Section 10(b) Individual Defendants—are collectively referred to as the "Individual Defendants." (*Id.* ¶ 47.) "Defendants" refers to all Defendants, i.e., the Securities Act Defendants, the Section 14(a) Defendants, and the Section 10(b) Defendants. (*Id.* ¶ 46.)

**III. Procedural History**

Robert Glick, individually and on behalf of all others similarly situated, initiated this action on May 6, 2022, against Defendants Arqit Quantum Inc., Williams, Pointon, Calabria, Chandler, Lefebvre, Jamieson, Ritchie, and Wilson. (Compl., Dkt. 1.) Glick alleged violations of the Exchange Act, as amended by the PSLRA. (*See generally id.*) On March 31, 2023, the Honorable Marcia M. Henry, Magistrate Judge, appointed Lead Plaintiff Weeks as lead Plaintiff on behalf of the Class. (Mem. & Order re: Mot. to Appoint Counsel & Lead Pl., Dkt. 24.) On April 14, 2023, Lead Plaintiff Weeks filed the action *Weeks v. Arqit Quantum Inc.*, No. 23-CV-2806, asserting claims under the Securities Act against the same defendants as in this action. (*Weeks*, No. 23-CV-2806 (PKC) (MMH), Compl. ("*Weeks* Compl."), Dkt. 1.) On May 16, 2023, this Court so-ordered Parties' stipulation to consolidate *Weeks* with this action. (5/16/2023 Docket Order.) On September 8, 2023, Weeks and Plaintiffs filed the Consolidated Complaint on behalf of three classes: the Section 14(a) Class, the Section 10(b) Class, and the Section 11 Securities Act Class. (Cons. Compl., Dkt. 43, ¶ 4(a)–(c).)

On April 26, 2024, Defendants' motion to dismiss the Consolidated Complaint was fully briefed.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Iqbal*, 556 at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The pleading standard does not require detailed factual allegations, but still "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "In addressing the sufficiency of a complaint[, the court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

## DISCUSSION

### I. Defendants' Allegedly False Statements

Plaintiffs have grouped Defendants' allegedly false statements ("Defendants' Statements" or "DSs")[13] into three categories: (1) Arqit's Technology[14] (statements "about Arqit's technology, *e.g.*, that it was completely 'secure' and solved all known problems with QKD"); (2) Low Cost and Scalability[15] (statements "that QuantumCloud's low cost made it easily scalable"); and

[13] In the Consolidated Complaint, Plaintiffs label each of these "False Statements." The Court therefore identifies each "DS" with a number corresponding to the numbering used in the Consolidated Complaint, i.e., DS1 is "False Statement 1," and so on. (*See, e.g.*, Cons. Compl., Dkt. 43, ¶ 213.)

[14] DS1–9, DS12–13, DS18–23, DS25–26, DS34–36, DS47, DS57–65, DS68–69, DS74–79, and DS81–86. (App. A, Dkt. 60-1.)

[15] DS10–11, DS14–17, DS38, DS51–52, DS54, DS66–67, DS70–73, and DS87–88. (App. A, Dkt. 60-1.)

(3) "Live" Products and Contracts[16] (statements "that QuantumCloud was 'live,' commercialized, being used by customers, and generating revenue"). (Pls.' Mem., Dkt. 60, at 4 n.7 (internal references omitted); App. A, Dkt. 60-1.[17]) Defendants, for their part, group the DSs into six categories, (*see* Defs.' Mem., Dkt. 59-1, at 5), but the Court adopts Plaintiffs' grouping of their own allegations for purposes of this Memorandum & Opinion.

**A. Where the DSs Were Made**

DS1–46 provide the bases for Plaintiffs' Securities Act claims, with DS1–29 allegedly violating Securities Act Sections 11, 12(a)(2), and 15, and DS30–46 allegedly violating Securities Act Sections 12(a)(2) and 15(a). (Pls.' Mem., Dkt. 60, at 4.) DS1–29 were made in the Offering Materials, and DS30–46 were made in the Other Prospectuses or Other Proxy Solicitations.[18] (*Id.* *See also* Cons. Compl., Dkt. 43, ¶¶ 209–57.) Here, the "Offering Materials" include: "(i) the final amended Registration Statement[19] as filed with the SEC on Form F-4/A on July 29, 2021[,]

---

[16] DS24, DS27–33, DS37, DS39–46, DS48–49, DS53, DS55–56, and DS80. (App. A, Dkt. 60-1.) This category also originally included DS50, before Plaintiffs withdrew claims related to that DS. (*Id.*; *see also* Pls.' Mem., Dkt. 60, at 4 n.6.)

[17] Defendants argue that Plaintiffs' Appendix A to their Memorandum "should be stricken or ignored as an attempt to evade the Court-ordered page limit." (Defs.' Reply, Dkt. 61, at 1 n.2.) Having reviewed Appendix A, the Court declines to strike the appendix because it does not contain new or additional arguments; rather, it organizes and recapitulates the DSs and the related allegations from the Consolidated Complaint (with citations to the Consolidated Complaint for each) into one table. Because this case contains a particularly large number of alleged misstatements, the Court finds that Appendix A serves as a convenient summary and reference with respect to the alleged misstatements in the Consolidated Complaint.

[18] "The [O]ther Prospectuses and Other Proxy Solicitations are . . . the same documents." (Pls.' Mem., Dkt. 60, at 4 n.5.) Except for direct quotations, which may vary, herein the Court uses the term "Other Prospectuses" to refer to both.

[19] "On July 30, 2021, the SEC declared the Registration Statement as amended on July 29, 2021[,] (the 'Registration Statement') as effective." (Cons. Compl., Dkt. 43, ¶ 178.)

(Registration No. 333-256591); (ii) the final amended Prospectus[20] as filed with the SEC on Form 424(b)(3) on July 30, 2021, which [was incorporated into and] forms part of the Registration Statement; and (iii) all documents incorporated by reference to the Registration Statement and Prospectus." (Cons. Compl., Dkt. 43, ¶¶ 81 n.41, 180.) The Registration Statement "was signed by Defendant Williams in his personal capacity, and was also signed by Defendants Jamieson and Wilson through Defendant Williams as their attorney-in-fact. Defendant Jamieson also signed the Registration Statement as an Authorized Representative of Arqit Quantum located in the United States." (*Id.* ¶ 179.)

"Other Prospectuses/Other Proxy Solicitations" refer to statements Defendants Williams, Richie, and Arqit Quantum and/or Centricus made in August 2021. (*See id.* ¶ 232.) These statements were made in two press releases and three investor presentations, each of which was "filed with the SEC pursuant to Rule 425 under the Securities Act and deemed filed pursuant to Rule 14a-12 under the Exchange Act." (*Id.* ¶¶ 233, 237, 241, 245, 251.) Thus, Plaintiffs allege, each "was a prospectus under SEC Rules and the Securities Act." (*Id.*)

DS1–46 are also part of the foundation of Plaintiffs' Exchange Act claims, with DS1–29 allegedly violating Exchange Act Sections 10(b), 14(a) and 20(a), and DS30–46 allegedly violating Exchange Act Sections 10(b), 14(a), and 20(a). (Pls.' Mem., Dkt. 60, at 4; *see also* Cons. Compl., Dkt. 43, ¶¶ 427, 438, 465, 479 ("repeat[ing] and realleg[ing] each and every allegation" from paragraphs that include DS1–46 for Plaintiffs' Exchange Act claims).) Plaintiffs' Exchange

[20] The "Prospectus" and the "Proxy Statement" are the same document. (Cons. Compl., Dkt. 43, ¶ 180; Pls.' Mem., Dkt. 60, at 4 n.5.) "[O]n July 30, 2021, Arqit Quantum filed a joint Proxy Statement for the Extraordinary Meeting of Shareholders of Centricus to consider the Merger and Prospectus for the 43,125,000 Arqit Quantum ordinary shares and 14,891,667 Arqit Quantum warrants to be issued in connection with the Merger on Form 424(b)(3) with the SEC (the 'Prospectus' or the 'Proxy Statement')." (Cons. Compl., Dkt. 43, ¶ 180.) Except for direct quotations, which may vary, herein the Court uses the term "Prospectus" to refer to both.

Act claims also rest, in part, on DS47–49 and 51–88, which allegedly violated Exchange Act Sections 10(b), 14(a), and 20(a). (Pls.' Mem., Dkt. 60, at 4.) DS47–49 and DS51–83 were made in various press releases, interviews, and reports filed with the SEC, while DS84–88 were made in the Offering Materials. (*Id.*)

**B. Contents of the DSs**

As noted *supra*, Plaintiffs have grouped the DSs into three categories (Arqit's Technology, Low Cost and Scalability, and "Live" Products and Contracts). The Court summarizes each below.

1. <u>"Arqit's Technology" DSs</u>

Statements in the first category, Arqit's Technology, generally describe Arqit's technology and tout its purported abilities to, for example, protect networked devices and store data securely. (*See, e.g.*, Cons. Compl., Dkt. 43, ¶ 238 (DS36: "The release of QuantumCloud™ 1.0 allows customers to secure devices globally by providing a strong device authentication capability, over which is layered the agreement of symmetric keys between authenticated and authorised devices."); *id.* ¶ 329 (DS62: "Arqit can store and transact data securely in the cloud and to include any form of end point device within this security boundary"); *id.* ¶ 331 (DS68: "The importance of Arqit's platform lies in its ability to 'distribute' symmetric keys securely at scale by creating them at end points").) These claims also include statements, which are repetitive at times, that Arqit's technology "has solved all previously known problems of quantum key distribution" and can protect devices from "current and future forms of cyber attack"; for example:

- DS1: Arqit "has pioneered a unique quantum encryption technology which makes the communications links of any networked device secure against current and future forms of cyber attack," (*id.* ¶ 213);

- DSs 2, 57, and 58: Arqit "has pioneered a unique quantum encryption technology which makes the communications links of any networked device secure against current and future forms of cyber[ ]attack‒even an attack from a quantum computer," (*id.* ¶¶ 213, 329);

- DSs 7 and 63: Arqit "invented a unique quantum encryption technology which makes the communications links of any networked device secure against current and future forms of cyber attack—even an attack from a quantum computer," (*id.*);

- DSs 13, 69, and 86: "Arqit's groundbreaking technology has solved these known issues. Its innovations create symmetric encryption keys at end points when they are needed, at scale, securely, at any kind of end point device and in groups of any size," (*id.* ¶¶ 215, 331, 455 (cleaned up));

- DSs 21 and 77: "Arqit's quantum satellite technology solves all previously known problems of quantum key distribution," (*id.* ¶¶ 217, 333 (cleaned up)); and

- DS61: "Arqit's platform creates symmetric encryption keys, which is a cyberencryption technology that is secure against all forms of attack including by quantum computers," (*id.* ¶ 329).

Plaintiffs allege that statements in this category were false and/or misleading because, *inter alia*, "Arqit's QuantumCloud product could not encrypt data in a quantum-safe manner[ and] did not have universal application to every edge device and cloud machine in the world." (*Id.* ¶¶ 214, 330.) They further allege that statements in this category give rise to an inference of scienter because, *inter alia*, Defendants were aware of unfavorable evaluations of Arqit's technology, relied on faulty reports to justify some of its decisions, and were present for discussions, meetings, and presentations wherein it was discussed that Arqit's technology was deficient. (*See, e.g.*, App. A, Dkt. 60-1, at 1–3.) Plaintiffs' sources for its allegations are three Confidential Witnesses ("CWs") and the WSJ Article, discussed *infra*. (*See id.*)

2. <u>"Low Cost" DSs</u>

Statements in the second category, "Low Cost" DSs, generally claim that the company was in a position with the capital it had then to scale its software and products for revenue. (*See, e.g.*, Cons. Compl., Dkt. 43, ¶¶ 215, 331, 455 (DSs 14, 15, 17, 70, 71, 73, and 88: claims that Arqit's software, products, and business model are "easily scalable" and/or "result[s] in low capital

expenditure"); *id.* ¶¶ 215, 324, 331, 455 (DSs 14, 54, 70, and 87: claims that Arqit's products can "create keys in infinite volumes at minimal cost" or are "infinitely scalable" at "a very low operating cost"); *id.* ¶ 238 (DS38: "We are now ready to scale up our platform for revenues this year"); *id.* ¶ 309 (DS52: "This company is capable of hyper scaling with the capital that it's already raised").) Some of these statements also claimed that Arqit's QuantumCloud product "creates unbreakable software encryption keys that are low cost and easy to use." (*See, e.g.*, *id.* ¶¶ 215, 331 (DSs 10 and 66: "Arqit's product, called QuantumCloud, <u>creates unbreakable software encryption keys that are low cost and easy to use with no new hardware required</u>"[21]); *id.* (DSs 11 and 67: "Arqit's product, called QuantumCloud™, <u>creates unbreakable software encryption keys that are low cost and easy to use</u>").)

Plaintiffs allege that statements in this category were false and/or misleading because, *inter alia*, "Arqit's QuantumCloud product as designed with satellites was not easily scalable, and could not create keys 'in infinite volumes at minimal cost' or at 'low cost,' and therefore could not take advantage of upcoming market opportunity or be commercialized for the mass market." (*Id.* ¶ 216.) They further allege that statements in this category give rise to an inference of scienter because, *inter alia*, Defendants were aware of unfavorable evaluations of Arqit's technology and either were or "would [have] be[en]" present for or knowledgeable about discussions, meetings, and presentations about the deficiencies in Arqit's technology. (*See, e.g.*, App. A, Dkt. 60-1, at 12–13 (citations omitted).) Plaintiffs' sources for its allegations here are again the three CWs and the WSJ Article. (*See id.*)

[21] At times, Plaintiffs denominated only part of a sentence as a DS and added emphasis to indicate which part of the statement is a DS. Where applicable, the Court has done the same throughout this Memorandum & Order.

3. "'Live' Products and Contracts" DSs

Statements in the third category, "'Live' Products and Contracts" DSs, generally claim that Arqit's technology was then live and being used by customers. (*See, e.g.*, Cons. Compl., Dkt. 43, ¶ 234 (DS30: "launched live for customers"); *id.* (DS31: Arqit's "encryption technology . . . launched live for customers today"); *id.* ¶ 235 (DS33: "the software is now live for commercial use"); *id.* ¶ 238 (DS37: "A growing number of customers in many sectors are now getting exposure to the transformational levels of security that can be provided by QuantumCloud™."); *id.* ¶¶ 243, 247, 253 (DSs 39, 40, 44: "QuantumCloud™ Release version 1.0 has been launched live to customers."); *id.* ¶ 249 (DS41: "We recently announced that the QuantumCloud™ product is live for service"); *id.* ¶ 255 (DS45: "The product is live with customers today. We're already taking the software to market."); *id.* ¶ 306 (DS48: "So, we've got a product that's live today. Its technology gets upgraded in two years' time but fundamentally it's just the same product throughout the model.").) This category also includes disclaimers and risk statements. (*See, e.g.*, *id.* ¶¶ 219, 335 (DSs 24 and 80: Arqit "may not be able to convert its customer orders in backlog or pipeline into revenue"; "Arqit's backlog estimates consisted of approximately $130 million in customer contracts, and Arqit had an estimated $975 million in pipeline"; "There is no assurance that its backlog will materialize in actual revenues, or that Arqit will be able to convert its pipeline into executed contracts that will generate revenues.")

Plaintiffs allege that statements in this category were false and/or misleading because, *inter alia*, "at the time" the statements were "made and at the time of the offering, QuantumCloud was only an early-stage prototype unable to encrypt anything in practical use, no commercial customer was using Arqit's software with live data, Arqit's system could not meaningfully use common internet protocols, and the success of Arqit's system required widespread adoption of new communications protocols." (*Id.* ¶ 236.) Plaintiffs further allege that statements in this category

give rise to an inference of scienter because, *inter alia*, Defendants were aware of unfavorable evaluations of Arqit's technology and either were or "would [have] be[en]" present for or knowledgeable about discussions, meetings, and presentations about the deficiencies in Arqit's technology. (*See, e.g.*, App. A, Dkt. 60-1, at 45–47 (citations omitted).) The three CWs and the WSJ Article are also Plaintiffs' sources for these allegations. (*See id.*)

## II. Plaintiffs' Sources

Defendants argue that Plaintiffs' falsity allegations lack adequate support because they rely in part on anonymous sources, including the three CWs and the WSJ Article that does not identify its sources. (Defs.' Mem., Dkt. 59-1, at 13–17.) Plaintiffs counter that the WSJ Article does disclose some "source identities," and that Arqit itself, "in its response to the WSJ Article . . . (perhaps unintentionally) confirmed that the sources for the article included two former employees." (Pls.' Mem., Dkt. 60, at 14–15 (citing Cons. Compl., Dkt. 43, ¶ 191).) Still, Plaintiffs do not dispute Defendants' argument that the article does not identify the sources for certain claims that appear in the Consolidated Complaint. (*Compare id.*, *with* Defs.' Mem., Dkt. 59-1, at 13–14 (citing Cons. Compl., Dkt. 43, ¶ 214(a)–(c)).) Because at least some of Plaintiffs' claims are subject to the heightened pleading requirements of FRCP 9 and the PSLRA, the Court applies those heightened standards in assessing Plaintiffs' sources.

In pleadings, "[p]laintiffs may . . . rely on confidential sources, i.e., persons identified other than by name," and may also—to an extent—rely on newspaper articles. *In re Sibanye Gold Ltd. Sec. Litig.*, No. 18-CV-3721 (KAM) (PK), 2020 WL 6582326, at *16 (E.D.N.Y. Nov. 10, 2020) (applying FRCP 9 and the PSLRA's particularity standards). "Newspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *Id.* (citation

omitted). When relying "on confidential sources to meet the requirements of the PSLRA, the sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (Defs.' Mem., Dkt. 59-1, at 14 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).) In short, "a plaintiff need only plead the 'probability that the confidential witness knows what [they are] talking about.'" *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) (quoting *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006)) (cleaned up) (applying FRCP 9 standard), *aff'd in relevant part sub nom Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("At the pleading stage, these allegations of falsity [by confidential witnesses] are sufficiently particular and plausible.").

### A. WSJ Article

The WSJ Article is sourced from "former employees and other people familiar with the company, and documents viewed by The Wall Street Journal." (WSJ Article, Dkt. 59-20, at ECF 2.) Plaintiffs' counsel corroborated the disclosures in the WSJ Article in interviews with the CWs. (Pls.' Mem., Dkt. 60, at 2.) Further, as Plaintiffs note, the press release Arqit put out after the release of the WSJ Article states that the article "seem[ed] to be based on little more than the unsubstantiated and out of date comments of two long departed and disgruntled former employees," which certainly appears to confirm that the sources for the WSJ Article are former Arqit employees. (Cons. Compl., Dkt. 43, ¶ 191.)[22]

[22] The Court notes that while the Consolidated Complaint contains no source, such as a URL, for the press release, (Cons. Compl., Dkt. 43, ¶ 191), Defendants do not dispute Plaintiffs' allegation that following the WSJ Article, Arqit issued a press release with the language contained in the Consolidated Complaint, (*see* Defs.' Reply, Dkt. 61, at 7).

The WSJ Article states that "[w]hen [Arqit] secured its [NASDAQ] listing . . . , its revenue consisted of a handful of government grants and small research contracts, and its signature product was an early-stage prototype unable to encrypt anything in practical use." (WSJ Article, Dkt. 59-20, at ECF 2.) And according to "numerous people inside and outside the company," "[t]he encryption technology [Arqit] hinges on—a system to protect against next-generation quantum computers—might never apply beyond niche uses . . . unless there were a major overhaul of internet protocols." (*Id.* at ECF 2–3.) Further, the WSJ Article states that "implementation of QuantumCloud would require 'broad adoption of new protocols and standards for telecommunications, cloud computing[,] and internet services' that were not widely supported." (Cons. Compl., Dkt. 43, ¶ 400.)

The Court finds that these statements, as well as the others from the WSJ Article on which Plaintiffs rely, are "sufficiently particular and detailed to indicate their reliability." *In re Sibanye Gold*, 2020 WL 6582326, at *16.

**B. CWs**

Plaintiffs' Consolidated Complaint also contains allegations sourced from three CWs. CW-1 "was employed by Arqit Quantum through subsidiary Arqit Limited as a Blockchain Developer from September 12, 2022[,[] to March 17, 2023," had "responsibilities as a member of the Innovation Team [that] included the research into and development of blockchain-based products into which QuantumCloud could potentially be implemented," and "reported to Guillermo Amodeo Ojeda, Arqit Quantum's Head of Applied Innovation, who in turn reported directly to" non-party Barry Childe, who was Arqit's Chief Innovation Officer ("CIO"). (Cons. Compl., Dkt. 43, ¶¶ 49–50.)

CW-2 "worked for Arqit Limited from November 2019 to November 2020 as a Blockchain Secure Terrestrial Communications Technician," had responsibilities that included the

"development of QuantumCloud software," and "met at least once per month with Childe and Defendant Williams to provide progress updates." (*Id.* ¶ 51.)

CW-3 never worked for Arqit but is "Director of Strategic Quantum Initiatives at ID Quantique SA ('IDQ')," which "is a leader in the fields of quantum-safe cryptography, scientific instrumentation and random number generation." (*Id.* ¶ 52.) CW-3 has "significant experience in fiber-based and space-based Quantum Cryptography." (*Id.*) On August 25, 2021, 13 days before Arqit Quantum listed on the NASDAQ, "CW-3 presented at a cybersecurity industry conference, QCrypt 2021[,] . . . wherein CW-3 raised concerns about scientific flaws within Arqit's patented ARQ19 protocol for quantum key distribution via satellite." (*Id.*) Further, Plaintiffs allege that prior to this presentation, CW-3 reviewed Arqit's ARQ19 patent for satellite QKD and "immediately recognized irregularities" with it, including that the "standard practice that patent owners publish their scientific discoveries in a scientific journal and encourage peer review and discussion" was not followed.[23] (*Id.* ¶ 133.) "CW-3 believed this was suspicious because it was to Arqit's benefit to be open about its findings; only by successfully defending critiques and attacks would the scientific community, investors, and customers believe [Arqit's] purported technological breakthrough was robust, correct, and quantum safe." (*Id.*) In other words, CW-3 stated[24] that "Arqit's behavior was very strange." (*Id.*)

Plaintiffs further allege that "Arqit was able to [temporarily] silence CW-3's critique" by sending CW-3, via the Dentons law firm, a letter threatening litigation. (*Id.* ¶¶ 52, 144, 147.) After the conference, "CW-3 solicited input from numerous cybersecurity professionals and researchers

[23] CW-1 and CW-2 corroborated that this is "standard practice." (Cons. Compl., Dkt. 43, ¶ 133.)

[24] Presumably to Plaintiffs' counsel, though the Consolidated Complaint does not clarify.

to develop a scientific paper further evaluating Arqit's ARQ19 patent." (*Id.* ¶ 147.) Together, CW-3 and authors from multiple countries submitted their findings in an article, entitled "Long-range QKD without trusted nodes is not possible with current technology" ("CW-3 Article")[25], that was published on September 9, 2022, in the scientific journal NPJ QUANTUM INFORMATION, a partner journal of the British journal NATURE. (*Id.*) The authors sent a copy of the article to Arqit before its publication. (*Id.*) The CW-3 Article, which Defendants do not acknowledge, lists nine named authors; though Plaintiffs do not identify which of these authors is CW-3, Plaintiffs clearly have been able to verify CW-3's identity.

Defendants argue that Plaintiffs' reliance on the CWs' statements is improper because these "confidential sources" are not "described [in the Consolidated Complaint] 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (Defs.' Mem., Dkt. 59-1, at 14 (quoting *Novak*, 216 F.3d at 314.) In sum, Defendants argue that: (1) the CWs could not have relevant knowledge because none of three CWs were employed at Arqit when the challenged statements were made; (2) CW-1's and CW-2's roles at Arqit could not have provided them with relevant insight; and (3) CW-3 "lack[ed] any basis to claim that Arqit's technology was not 'truly quantum safe'" because CW-3 based his assessment on a review of Arqit's patent and "the patent [was] not a sufficient basis to evaluate Arqit's technology" because, according to CW-3 himself, "Arqit did not provide 'scientific disclosure' after filing its patent such that 'no independent experts were given the opportunity to comment on it.'" (Defs.' Mem., Dkt. 59-1, at 15–17 (quoting Cons. Compl., Dkt. 43, ¶ 133).)

---

[25] Because the article is cited to and relied upon in the Consolidated Complaint, the Court deems it to be incorporated by reference into the Consolidated Complaint. *See supra* n.10; (Cons. Compl., Dkt 43, ¶ 147 n.67).

The Court is not persuaded and finds that Plaintiffs had a sufficient basis to rely upon the CWs' statements and information to support their allegations that Arqit knowingly made false statements regarding its technology. Although CW-1's and CW-2's roles at Arqit might not have overlapped with the filing of the Registration Statement, it is entirely plausible to infer that both of these former Arqit employees, both of whom had responsibilities relating to the development of "blockchain-based products into which QuantumCloud could potentially be implemented," (Cons. Compl., Dkt. 43, ¶ 50; *see also id.* ¶ 51), and who worked at the company near the time of the Merger, (*id.* ¶¶ 50–51), had sufficient experience to provide competent and credible information to support Plaintiffs' allegations about the false statements made by Defendants starting in July 2021. *See Nguyen*, 297 F. Supp. 3d at 484 (finding that the fact the confidential source's tenure at defendant's company included "a period leading up to" the relevant event strengthened plaintiffs' allegations regarding source's role). Moreover, as Plaintiffs argue, if Arqit's "product was still a prototype *after* the Merger," during CW-1's tenure, "then it clearly was [a prototype] *at the time of* the Merger." (Pls.' Mem., Dkt. 60, at 16 (emphasis in original).) Regarding CW-3, while that person never worked at Arqit, given their job as a Director of Strategic Quantum Initiatives, their presentation at QCrypt 2021, and their publication—in collaboration with several other authors—in NPJ QUANTUM INFORMATION, the Court is persuaded that Plaintiffs have sufficiently pled that this witness has relevant expertise and experience to support the allegations of false statements in the Consolidated Complaint. As to the substance of CW-3's statements, Defendants fail to explain why Arqit's failure to provide scientific disclosure was not "strange" or "suspicious," as alleged by CW-3.

Thus, the Court finds that the Consolidated Complaint has alleged with "sufficient particularity" that all three CWs occupied positions in which they would have "possess[ed] the

information alleged" in support of Plaintiffs' fraud claims. *Novak*, 216 F.3d at 314; *see Nguyen*, 297 F. Supp. 3d at 484 ("A plaintiff need only plead the 'probability that [the confidential witness] know[s] what [they are] talking about.'" (first two alterations in original) (quoting *In re EVCI Colls.*, 469 F. Supp. 2d at 97)).

## III. Securities Act Claims

### A. Count One: Violation of Section 11 of the Securities Act, 15 U.S.C. § 77k

Plaintiffs allege that the Securities Act Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, by making materially misleading statements in the Registration Statement.

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). The relevant statutory provision provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security. . . may, either at law or in equity, in any court of competent jurisdiction, sue.

15 U.S.C. § 77k(a).

#### 1. <u>Standing</u>

Defendants first argue that Plaintiffs lack standing to bring their Section 11 claims because they cannot trace Lead Plaintiff Weeks's shares to the allegedly misleading Registration Statement. (Defs.' Mem., Dkt. 59-1, at 7.) They further argue that Weeks's "lack of standing is also fatal to all Plaintiffs' Section 11 claims because [he] is the only named plaintiff who filed Securities Act claims before the [one]-year statute of limitations expired." (*Id.* at 9 (citing 15 U.S.C. § 77m).) The Court disagrees on both counts.

For a plaintiff to have standing under Section 11, "the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023); *see In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 206 (S.D.N.Y. 2003) (holding that plaintiffs asserting Section 11 claim must be able to "trace their shares to an allegedly misleading registration statement" (quoting *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003))). "At least one named plaintiff must be a member of that class—that is, a named plaintiff must have purchased shares traceable to the challenged offering." *Id.* at 207. A registration statement is "effective only as to the securities specified therein as proposed to be offered." 15 U.S.C. § 77f(a). These securities must be "registered under the particular registration statement alleged to contain a falsehood or misleading omission," *Slack Techs., LLC*, 598 U.S. at 767, and do not include securities that merely "bear some sort of minimal relationship to a defective registration statement," *id.* at 768. Once a market contains securities issued pursuant to multiple registration statements, it is "virtually impossible to trace shares to a [single] registration statement." *In re Initial Pub. Offering*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004), *vacated on other grounds*, 471 F.3d 24 (2d Cir. 2006). And so a plaintiff may establish traceability "through proof that the owner bought [their] shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *Id.* at 117–18.

As explained *supra*, the SEC declared the Registration Statement effective on July 30, 2021, and Arqit Quantum securities entered the market on September 7, 2021. (Cons. Compl., Dkt. 43, ¶¶ 178, 187.) Judy Smith, Lead Plaintiff Weeks's wife, purchased shares of Arqit securities between November 18, 2021, and December 3, 2021, and assigned them to Weeks on July 4, 2022. (*Id.* ¶ 23; Weeks Certification, Dkt. 43-1, at ECF 1–3.) Defendants argue that Weeks's shares "are not traceable to the allegedly misleading Registration Statement" because

these shares were not acquired until "more than a month after Arqit filed an intervening registration statement on October 8, 2021" (Defs.' Mem., Dkt. 59-1, at 7–8 (citing Defs.' Ex. M ("10/8/2021 Registration Statement"), Dkt. 59-16).) Plaintiffs counter that the shares traceable to that second registration statement "never reached the market before Weeks' purchase." (Pls.' Mem., Dkt. 60, at 6.) In other words, "the *only* Arqit warrants in the market at the time of Weeks' purchases were issued pursuant and traceable to the Registration Statement." (*Id.* at 6–7 (emphasis in original).) Defendants do not dispute this in their Reply, instead arguing that "shares issued under the Registration Statement had been commingled with new securities *registered* on October 8, 2021." (Defs.' Reply, Dkt. 61 at 13 (emphasis added).)

Defendants' argument rests on the faulty premise that the operative event for purposes of determining traceability is the issuance of the registration statement. Not so. Rather, the relevant event is the entrance into the market of securities issued pursuant to a particular registration statement. *See In re Initial Pub. Offering*, 227 F.R.D. at 117–18 (finding traceability established where the securities at issue were purchased from a market that exclusively contained securities issued pursuant to a single registration statement). Here, the record shows that the only Arqit securities in the market at the time Judy Smith purchased them were Arqit shares and warrants issued pursuant and traceable to the Registration Statement. First, the October 8, 2021 registration statement states that Arqit "may not sell these [new] securities until the registration statement filed with the [SEC] is effective." (10/8/2021 Registration Statement, Dkt. 59-16, at ECF 3.) This clearly indicates that the securities issued pursuant to the October 8, 2021 registration statement had not entered the market as of that date, because Arqit could not sell them until after the October 8, 2021 registration statement became effective. Defendants do not clarify when this registration statement became effective, nor could the Court, on its own, identify when this

occurred. Second, no additional ordinary shares entered the market between the October 8, 2021 registration statement and the last purchase of Weeks's securities on December 3, 2021, as evidenced by a comparison of: Arqit's October 8, 2021 registration statement, stating that 120,073,430 ordinary shares were "issued and outstanding as of October 6, 2021," (*id.* at ECF 102), and Arqit's December 16, 2021, SEC Annual Report Form 20F ("December 2021 Form 20-F"), stating that the exact same number of "ordinary shares [were] issued and outstanding as of December 14, 2021," (Defs.' Ex. P ("December 2021 Form 20-F"), Dkt. 59-19, at ECF 60). This clearly indicates that no additional Arqit shares entered the market between October 6, 2021, (i.e., two days before the October 8, 2021 registration statement) and December 14, 2021, (i.e., after Weeks's securities were purchased). Last, the December 2021 Form 20-F confirms that the Arqit warrants registered under the October 8, 2021 registration statement would not enter the market until 2022 at the earliest. Specifically, the December 2021 Form 20-F states that, as of December 14, 2021, Centricus Heritage LLC held "6,266,667 warrants[,] which will become exercisable on February 8, 2022, . . . [and] which are expected to be distributed . . . by Centricus Heritage LLC . . . within the next 60 days," (*id.* at ECF 60–61). The same number of warrants to purchase ordinary shares—6,266,667—are listed in the October 8, 2021 registration statement to be registered in the future. (10/8/2021 Registration Statement, Dkt. 59-16, at ECF 3.) This shows that the 6,266,667 warrants to be registered pursuant to the October 8, 2021 registration statement did not enter the market before December 14, 2021, and indeed likely did not enter the market until two months later. Thus, Lead Plaintiff Weeks's securities—purchased between November 18, 2021, and December 3, 2021, (Weeks Certification, Dkt. 43-1, at ECF 1–2)—were purchased before any securities issued pursuant to the October 8, 2021 registration statement were in the market.

Because the only securities that Judy Smith could have purchased between November 18 and December 3, 2021, were those issued pursuant to the Registration Statement, Plaintiffs have established traceability. *In re Initial Pub. Offering*, 227 F.R.D. 65 at 118. Plaintiffs therefore have standing to bring a Section 11 claim, and the Court need not address Defendants' statute of limitations argument.

2. Pleading Standard

The parties dispute whether the appropriate pleading standard for Plaintiffs' Sections 11 and 12(a)(2) of the Securities Act claims is FRCP 9(b)—the heightened standard that applies to fraud claims under Section 10(b) of the Exchange Act—or the lesser pleading standard of FRCP 8. *Compare* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."), *with* Fed. R. Civ. P. 8(a)(2) (providing that pleading must contain "short and plain statement" of claim showing pleader's entitlement to relief). For the reasons set forth below, the Court applies the FRCP 8 pleading standard.

In assessing Section 11 claims, courts must determine whether a plaintiff's allegations are "premised on fraud, or merely on negligence." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* ("*UBS*"), 752 F.3d 173, 183 (2d Cir. 2014) (internal citation and quotations omitted). FRCP 8 governs when the claims allege that the registration statement was prepared negligently, rather than fraudulently, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 620–21 (2d Cir. 2009) (summary order), or when the complaint "explicitly does not allege fraud," *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). FRCP 9(b)'s heightened standard governs instead when the claims "sound in fraud" and are "identical" to a plaintiff's Section 10(b) claims. *UBS*, 752 F.3d at 183. Second Circuit authority does not "foreclose[] pleading Section 10(b) fraud and Section 11 negligence as alternatives with the former claim to be

governed by [FRCP] 9(b) and the latter by [FRCP] 8." *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491, at *1 (2d Cir. Oct. 28, 2024) (summary order).

Courts must look beyond how plaintiffs "styled or denominated" the underlying claims to "the conduct alleged." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). The "mere expedient of disclaiming" that a plaintiff's Section 11 claims sound in fraud will not help that plaintiff "avoid the strictures of [FRCP] 9(b)." *Pappas*, 2024 WL 4588491, at *2. But a Section 11 "claim sounding in negligence or strict liability will not be subjected to the heightened standards of Rule 9(b) merely because of the complaint's other claims." *Id.* (citing *Rombach*, 355 F.3d at 171–72, 178). Plaintiffs "may retain the application of the [FRCP] 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 . . . claim[] implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims." *Id.* When, after "thoroughly examining [a] complaint," a court finds that plaintiffs' "allegations would be evaluated under [FRCP] 8 if contained in a stand-alone complaint alleging violations only of the Securities Act[,] they will not be held to a higher standard because [plaintiffs] also exercised [their] right to sue [d]efendants for securities fraud under the Exchange Act." *Id.* "[T]he mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently[,] or innocently made) does not make it fraudulent." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007). Similarly, allegations that a defendant knew but did not disclose a fact do "not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud." *Pappas*, 2024 WL 4588491, at *2 (quoting *In re Orion Sec. Litig.*, No. 08-CV-1328 (RJS), 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009)). But "[s]uch circumstances may be contrasted with cases in which the plaintiff [has] alleged that defendants intentionally concealed information in the filing at issue." *Id.* at *3.

Plaintiffs assert Count I "on behalf of . . . the Securities Act Class against all Securities Act Defendants pursuant to Section 11," (Cons. Compl., Dkt. 43, ¶ 262), and allege that "[a]t the time the Registration Statement became effective, the Registration Statement contained untrue statements of material fact or omitted to state a material fact[] required to be stated therein or necessary to make the statements therein not misleading," (*id.* ¶ 265). Plaintiffs further "expressly exclude[] and disclaim[] any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act." (*Id.* ¶ 263.) And "[f]or purposes of asserting this Count, Plaintiff[s] do[] not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim." (*Id.*)

The Court finds that Plaintiffs' Section 11 claim does not sound in fraud, but rather sounds in negligence. First, as reflected in the above-recited allegations, Plaintiffs have "disclaim[ed] fraud" and "eschew[ed] language in [their] Section 11 . . . claim[] implying fraud or the elements thereof." *Pappas*, 2024 WL 4588491, at *2. Second, Plaintiffs have "made more than nominal efforts to distinguish th[is] negligence-based claim[] from the[ir] fraud-based claims" by "separating allegations supporting fraud claims from allegations supporting negligence claims." *Id.* Here, Plaintiffs have provided additional factual allegations and DSs in the Complaint after their Securities Act claim and before their Exchange Acts claims, in support of a Section 11 claim based on negligence. (*See* Cons. Compl., Dkt. 43, ¶¶ 299–426, 448–64.) For example, Plaintiffs' Exchange Act claims include the following DSs that are not part of Plaintiffs' Section 11 claim: (1) DS47–50, made by Defendant Williams during a September 7, 2021 interview; (2) DS51–52, made by Williams during a September 9, 2021 conference; and (3) DS53, made in a

December 16, 2021 press release that Arqit filed with the SEC in a Form 6-K. (*Id.* ¶¶ 305–306, 309, 318–320.)

Thus, Plaintiffs have sufficiently alleged Section 11 claims sounding in negligence, to which the FRCP 8 pleading standard applies. The Court now assesses the sufficiency of Plaintiffs' allegations regarding their Section 11 claim.

3. Sufficiency of Section 11 Claim

Defendants also argue that Plaintiffs' Section 11 claim should be dismissed because the DSs are not false or misleading within the broader context of Arqit's disclosures. (Defs.' Mem., Dkt. 59-1, at 19.)

"To state a claim under [S]ection 11, the plaintiff must allege that: (1) [they] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under [S]ection 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley*, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)). Claims brought under Section 11 of the Securities Act do not need to allege scienter, reliance, or loss causation. *Id.* at 359.

As discussed *supra*, Judy Smith purchased Lead Plaintiff Week's shares of Arqit securities between November 18 and December 3, 2021, satisfying the first element of a Section 11 claim. (Weeks Certification, Dkt. 43-1, at ECF 1–2.) Each Securities Act Individual Defendant was named in the Registration Statement as either a director at the time of the filing of the Registration Statement or about to become a director, satisfying the second element. (*See* Cons. Compl., Dkt. 43, ¶¶ 31–39); 15 U.S.C. § 77k(a)(2)–(3).

The third element of a Section 11 claim concerns whether "the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley*, 592 F.3d at 358–59 (quoting 15 U.S.C. § 77k(a)). "A statement is materially misleading when 'the defendant's representations, taken together and in context, would have misled a reasonable investor.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *Rombach*, 355 F.3d at 172 n.7). "A statement or omission is material if a reasonable investor would have considered it significant in making investment decisions." *Lematta v. Casper Sleep, Inc.*, No. 20-CV-2744 (MKB), 2022 WL 4637795, at *8 (E.D.N.Y. Sept. 30, 2022) (quoting *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (summary order)). "Because questions of materiality are 'inherently fact-specific,'" the Second Circuit has "held that 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 126 (2d Cir. 2013) (alteration in original) (first quoting *Basic Inc. v. Levinson*, 458 U.S. 224, 236 (1988); and then quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). A statement of opinion can give rise to liability under Section 11 "[i]f, for example, 'a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself.'" *New Eng. Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 41–42 (2d Cir. 2023) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)).

Defendants argue that Plaintiffs have failed to sufficiently plead a material misstatement or omission because "none of the challenged statements is false when read in context of all of Arqit's other detailed disclosures." (Defs.' Mem., Dkt. 59-1, at 19 (first citing *Rombach*, 355 F.3d at 173; and then citing *Zhou v. NextCure, Inc.*, No. 20-CV-7772 (LTS) (RWL), 2023 WL 4493541, at *11 (S.D.N.Y. July 12, 2023)).) For example, Defendants argue that DS7,[26] which states that "Arqit has invented a unique quantum encryption technology which makes the communications links of any networked device secure against current and future forms of cyber attack—even an attack from a quantum computer," (Cons. Compl., Dkt. 43, ¶ 213), was not false or misleading because "Arqit never claimed to have a fully-operational technology, and consistently disclosed that its technology was 'still under development,'" (Defs.' Mem., Dkt. 59-1, at 19–20 (citations omitted)). Defendants then cite to various statements, including the Registration Statement, in which Arqit acknowledged that it was "still in the process of developing . . . software" and developing "operational technology." (*Id.* (quoting Defs.' Ex. A ("7/29/2021 Registration Statement"), Dkt. 59-4, at 35, 43).) Plaintiffs counter that DS7 and statements like it were materially misleading because "at the time they were made and at the time of the Offering, Arqit's QuantumCloud product could not encrypt data in a quantum safe-manner, did not have universal application to every edge device and cloud machine in the world, and would not provide an early source o[f] revenue." (App. A, Dkt. 60-1, at 1. *See also* Pls.' Mem., Dkt. 60, at 12.) In short, Plaintiffs allege that the product did not work at all, despite Arqit representing that it did, and Defendants argue that Arqit never claimed that its technology was fully functional.

[26] As previously noted, DS7 is similar to several other DSs, *see supra* Discussion § I.B.1, making this analysis more broadly applicable to Defendants' other allegedly false statements.

Defendants' arguments fall short, in part, because the disclaimers on which they rely merely state generally that some technology was still under development, and do not state that the specific capabilities described in the challenged DSs were still under development. For example, DS7 does not state that Arqit was *developing* some form of technology that *would be* secure—it states that Arqit "*has invented* a unique quantum encryption technology" that "*makes* the communications link of any networked device secure against current and future forms of cyber attack—*even an attack from a quantum computer*." (Cons. Compl., Dkt. 43, ¶ 213 (emphasis added).) It is written in the present tense without qualification or hedging, and specifically states that Arqit's technology renders networked devices safe from attacks from quantum computers. As a result, nothing in the language of DS7 gives the impression that this quantum encryption technology was still under development at that time. The disclaimers to which Defendants point are also not redemptive because they are located nowhere near the challenged DSs: Defendants point to disclaimers at pages 35 and 43 of the Registration Statement, while DS7 is located on page 187. (Defs.' Mem., Dkt. 59-1, at 20 (quoting 7/29/2021 Registration Statement, Dkt. 59-4, at 35, 43); Cons. Compl., Dkt. 43, ¶ 213 n.112; 7/29/2021 Registration Statement, Dkt. 59-4, at 187.) In sum, the Court finds that Defendants' "representations, taken together and in context, would have mislead a reasonable investor," and are thus material. *Altimeo Asset Mgmt.*, 19 F.4th at 151 (quoting *Rombach*, 355 F.3d at 172 n.7). Indeed, "a reasonable investor certainly would have considered" the statement that Arqit's technology worked as described "significant in making investment decisions." *LeMatta*, 2022 WL 4637795, at *8 (quoting *Altayyar*, 731 F. App'x at 37).

The caselaw on which Defendants rely is also unavailing. In *Rombach*, unlike here, "nothing in the complaint explain[ed] with adequate specificity how [the challenged] statements were actually false or misleading." 355 F.3d at 172. Further, the statements at issue in *Rombach*

were qualitatively different from the DSs Plaintiffs challenge here, making the falsity of the statements in *Rombach* less evident. In *Rombach*, the challenged statements allegedly assured investors that the integration of new acquisitions was proceeding "smoothly," despite the defendants knowing that there were problems related to the integration. *Id.* By contrast, here, Plaintiffs allege that many of the DSs represented that Arqit had invented new forms of technology that were functional when, in fact, they were not. (*See* Cons. Compl., Dkt. 43, ¶¶ 213, 215, 217). Whether or not a project is going "smoothly" is far more subjective than whether or not a technology works, and thus it is less obvious that a statement about a project going smoothly is false simply because some problems have arisen.

The challenged statements in *Zhou*, too, are distinct from this case. For example, defendants there described a certain treatment as "having the *potential* to treat multiple cancer indications," 2023 WL 4493541, at *4 (cleaned up and emphasis added), whereas here, as explained above, several of the DSs touted Arqit's then-current capabilities. (*See*, *e.g.*, Cons. Compl., Dkt. 43, ¶ 213 (DS1: Arqit's "unique quantum encyption technology . . . makes the communications links of any networked device secure against current and future forms of cyber[ ]attack"; DS4: "Arqit has . . . invented a ground-breaking new quantum protocol," and Arqit "has also found a way to translate the benefits of quantum security to end point devices"); *id.* ¶ 215 (DS12: describing Arqit's "ability to 'distribute' symmetric keys securely at scale").)

The Court therefore finds that Plaintiffs have adequately alleged certain false or misleading statements in support of their Section 11 claim. Although Defendants make arguments related to other DSs that comprise Plaintiffs' Section 11 claim, (*see* Defs.' Mem., Dkt. 59-1, at 19–24), having found that the Section 11 claim will proceed, the Court finds it is unnecessary to go through all of the challenged DSs at this stage of proceeding.

* * *

For the reasons explained above, the Court finds that Plaintiffs have adequately alleged a violation of Section 11 of the Securities Act. Defendants' motion to dismiss Plaintiffs' Section 11 claim is denied.[27]

**B. Count Two: Violation of Section 12(a)(2) of the Securities Act**

Plaintiffs and the Securities Act Class allege that Defendants Arqit Quantum, Williams, and Ritchie violated Section 12(a)(2) of the Securities Act, 17 U.S.C. § 77l(a)(2), by making materially misleading statements (DS1–46) in the Prospectus and Other Prospectuses. (Cons. Compl., Dkt. 43, ¶¶ 276–87; Pls.' Mem., Dkt. 60, at 4.)

1. Standing

Defendants argue that Plaintiffs lack standing because they did not purchase securities directly in any offering. Plaintiffs respond that Plaintiff Littlejohn purchased securities directly in an offering because he "held Centricus securities at the time of the Merger and received Arqit securities in exchange for them in the offering." (Pls.' Mem., Dkt. 60, at 7 (citing Cons. Compl., Dkt. 43, ¶¶ 26, 184–85).) The Centricus IPO began on February 4, 2021, and ended on February 8, 2021. (Cons. Compl., Dkt. 43, ¶ 170.) Littlejohn purchased 1,000 Centricus units on March 1, 2021. (Littlejohn Certification, Dkt. 43-4, at ECF 2.) The Prospectus was issued on

[27] Defendants make three other arguments in support of dismissal of Plaintiffs' Section 11 claims, namely, that some of the DSs are (1) puffery, which cannot support a securities violation; (2) inactionable opinion statement; or (3) inactionable forward-looking statements. (*See* Defs.' Mem., Dkt. 59-1, at 23–24.) The Court finds it unnecessary to address these arguments and therefore declines to do so. The resolution of these arguments will not affect the outcome of this motion or the course of the litigation because Defendants are not challenging many of the DSs on these grounds. Therefore, even if the Court were to dismiss some or all of the DSs that Defendants challenge on these three grounds, Plaintiffs' claims would still survive the motion to dismiss. Furthermore, Defendants will have the opportunity to raise these arguments at a later stage in this proceeding after discovery has concluded.

July 30, 2021, and the Other Prospectuses were made on various dates in August 2021. (Cons. Compl., Dkt. 43, ¶ 280.) Following the September 2, 2021 merger, "all security holders of Centricus became holders of Arqit Quantum securities," so long as those holders did not instead "elect[] to redeem their Centricus ordinary shares for cash." (*Id.* ¶ 185.) Littlejohn evidently did not elect to redeem his Centricus ordinary shares for cash, and instead "received Arqit securities in exchange for them in the Offering." (Pls.' Mem., Dkt. 60, at 7.) Thus, after the Other Prospectuses were made, Littlejohn chose to receive Arqit securities in the Offering.

Defendants point to *In re Carlotz, Inc. Securities Litigation*, 667 F. Supp. 3d 71 (S.D.N.Y. 2023), to argue that Plaintiffs' Section 12(a)(2) claim should be dismissed for lack of standing. (Defs.' Mem., Dkt. 59-1, at 9–10.) There, another case involving a SPAC, the district court acknowledged that "the Second Circuit has not squarely addressed the application of Sections 11 and 12 to SPACs" and dismissed the plaintiffs' Section 12(a)(2) claim for lack of standing because they had not "purchased their shares in an initial public offering." *In re Carlotz*, 667 F. Supp. 3d at 82–83 (citation omitted). Defendants also rely on *Garnett v. RLX Technology Inc.*, 632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022), wherein the district court stated that "[p]laintiffs who purchased securities in a secondary market or aftermarket lack standing."

The Court, however, declines to follow either *In re Carlotz* or *Garnett*. *In re Carlotz* is not controlling on this Court and, as the district court there noted, there is no Second Circuit authority regarding the application of Section 12 to SPACs. And *Garnett*, as noted, involved securities purchased in the secondary market or aftermarket, which is not the situation here.

As Plaintiffs argue, "[a] Securities Act 'sale' includes mergers wherein securities of one corporation are exchanged for those of another corporation," as occurs in a de-SPAC transaction. (Pls.' Mem., Dkt. 60, at 7 (citing 17 C.F.R. § 230.145(a)(2)).) Indeed, in the Merger, Plaintiff

Littlejohn exchanged his Centricus ordinary shares in exchange for Arqit securities, which straightforwardly fits within the definition of a "sale" under the Securities Act. (*Id.*) Further, a de-SPAC transaction does not take place within "a secondary market or aftermarket." *Garnett*, 632 F. Supp. 3d at 614. Quite the opposite: Littlejohn purchased Centricus shares in March 2021 and sold them on May 31, 2022, (Littlejohn Certification, Dkt. 43-4, at ECF 2), meaning that on September 2, 2021—as part of the Merger and not via an aftermarket or secondary market transaction—he "became [a] holder[] of Arqit Quantum securities," (Cons. Compl, Dkt. 43, ¶ 185).

While Defendants note in their reply that the SEC recently adopted a new rule, Rule 145a, that "deems any business combination of a reporting shell company . . . involving an entity that is not a[nother] shell company to involve a sale of securities under the Securities Act to the reporting shell company's shareholders," they argue Rule 145a "does not apply here" because it took effect on July 1, 2024. (Defs.' Reply, Dkt. 61, at 14 (citation omitted).) As explained in the final rules and guidance for Rule 145a, the new rule "is intended to address concerns . . . . that reporting shell company shareholders may not [currently] receive the Securities Act protections (including disclosure and liability) they receive in a traditional IPO because of transaction structure." 89 Fed. Reg. at 14291. First, the Court need not consider Defendants' argument here because it was raised for the first time on reply. *See Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016) (explaining that courts will not consider "arguments first raised in reply papers in support of a motion," except when "reply papers . . . properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party" (first quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993); and then quoting *Domino Media, Inc. v. Kranis*, 9 F. Supp. 2d 374, 387 (S.D.N.Y. 1998))), *aff'd*, 707 F. App'x 724 (2d Cir. 2017) (summary order))). Second, even if the Court were to consider this belatedly raised argument, the

Court would view Rule 145a as clarifying what was otherwise a disputed area, and not as intended to do anything more than remove doubt that de-SPAC transactions constitute "sales" of securities under the Securities Act.

In sum, the Court finds that Littlejohn's exchange of Centricus ordinary shares for Arqit securities in the de-SPAC transaction constitutes a "sale" for purposes of Section 12(a)(2) and that Plaintiffs therefore have standing for their Section 12(a)(2) claim.

2. Sufficiency of Section 12(a)(2) Claim

Defendants also argue that Plaintiffs' Section 12(a)(2) claim should be dismissed: (1) as to Defendants Williams and Ritchie because Plaintiffs have failed to sufficiently allege that they were "statutory sellers"; (2) as to all Securities Act Defendants because the statements characterized as "Other Prospectuses" do not qualify as prospectuses; and (3) as to all Securities Act Defendants because Plaintiffs have failed to sufficiently allege that the DSs that make up the Section 12(a)(2) claim are materially false.

"Section 12(a)(2) of the Securities Act imposes liability on any person who offers or sells securities by means of a prospectus containing material misstatements." *Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005). It provides redress similar to what Section 11 provides "where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley*, 592 F.3d at 359. "[T]he elements of a *prima facie* claim under a [S]ection 12(a)(2) claim are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *Id.* (cleaned up) (quoting 15 U.S.C. § 77l(a)(2)). The Second Circuit has long "conclude[d] that a Section 12(a)(2) claim cannot be maintained by a private purchaser

of securities." *Yung*, 432 F.3d at 147. As with Plaintiffs' Section 11 claim, the Court applies the FRCP 8 pleading standard here.

a) Statutory Sellers

Defendants argue that Plaintiffs' Section 12(a)(2) claim against Defendants Williams and Ritchie fail because the Consolidated Complaint does not plead that either is a "statutory seller."[28] (Defs.' Mem., Dkt. 59-1, at 10.) "An individual is a 'statutory seller'—and therefore a potential [S]ection 12(a)(2) defendant—if [they]: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicited the purchase of a security, motivated at least in part by a desire to serve [their] own financial interests or those of the securities' owner.'" *In re Morgan Stanley*, 592 F.3d at 359 (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988) (cleaned up)). Defendants argue that Plaintiffs failed to plead that Williams and Ritchie are statutory sellers because Plaintiffs "do not allege that any named plaintiff purchased Arqit securities ***as a result*** of [Williams's and Ritchie's] solicitation." (Defs.' Mem., Dkt. 59-1, at 10 (emphasis in original).) As Plaintiffs point out, "Defendants do not contest Arqit is a statutory seller as it transferred the title of the Arqit securities." (Pls.' Mem., Dkt. 69, at 7 n.12 (citing Defs.' Mem., Dkt. 59-1, at 10).) Practically speaking, then, there is no dispute that Plaintiffs have adequately alleged that at least one Defendant, Arqit, is a statutory seller—and that the Consolidated Complaint therefore satisfies this element of a *prima facie* Section 12(a)(2) claim. Still, the Court addresses Defendants' argument regarding Williams and Ritchie below.

[28] Though Defendants style this argument as a challenge to Plaintiff's standing to bring a Section 12(a)(2) claim, (Defs.' Mem., Dkt. 59-1, at 10), as previously explained, whether the defendant is a statutory seller is instead an element of a *prima facie* claim under Section 12(a)(2). *In re Morgan Stanley*, 592 F.3d at 359.

Plaintiffs state that "reliance is not an element of Section 12(a)(2)." (Pls.' Mem., Dkt. 60, at 8 (citing *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156–57 (2d Cir. 2012)).) "The Second Circuit has yet to define the activities that constitute successful solicitation, but it has advised that an individual must have done more than engage in activities that were preliminary to the offering." *Garnett*, 632 F. Supp. 3d at 615 (quoting *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 259 (S.D.N.Y. 2020)). "[C]ourts in this Circuit overwhelmingly agree that '[a] pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2).'" *Sharma v. Rent the Runway, Inc.*, No. 22-CV-6935 (OEM) (VMS), 2024 WL 4287229, at *21 (E.D.N.Y. Sept. 25, 2024) (second alteration in original) (quoting *In re Weight Watchers*, 504 F. Supp. 3d at 245).

The Consolidated Complaint alleges that Defendants "Williams and Ritchie were statutory sellers under Section 12(a)(2) because they actively solicited the exchange of Centricus securities for Arqit Quantum securities for their own financial benefit." (Cons. Compl., Dkt. 43, ¶ 284.) Further, Plaintiffs allege that Williams and Ritchie made statements in the August 2021 "Other Prospectuses," including two press releases and three investor presentations. (*Id.* ¶¶ 232, 233, 237, 241, 245, 251.) "Although summary, these allegations suggest that [Williams and Ritchie] did 'more than engage in activities that were preliminary to the offering,'" and so "at the pleading stage, the Court cannot conclude that [they] are incapable of being held liable under Section 12(a)(2) on the ground that they were not statutory sellers." *Garnett*, 632 F. Supp. 3d at 615 (quoting *In re Weight Watchers*, 504 F. Supp. 3d at 259).

The Court therefore finds that Plaintiffs have adequately alleged that Defendants Arqit, Williams, and Ritchie are statutory sellers under Section 12(a)(2) of the Securities Act.

b) Prospectus

Defendants argue that the DSs that Plaintiffs have labeled "Other Prospectuses" do not qualify as prospectuses under the Security Act and that therefore DSs made within them are not actionable under Section 12(a)(2). (Defs.' Mem., Dkt. 59-1, at 10–11.)

A prospectus "offers any security for sale or confirms the sale of any security," 15 U.S.C. § 77b(10), and "the word 'prospectus' refers to 'documents related to public offerings by an issuer or its controlling shareholders,' namely, documents that 'must include the information contained in the registration statement,'" *Anegada Master Fund, Ltd. v. PXRE Grp., Ltd.*, 680 F. Supp. 2d 616, 620 (S.D.N.Y. 2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). "When the 1933 Act was drawn and adopted, the term 'prospectus' was well understood to refer to a document soliciting the public to acquire securities from the issuer." *Gustafson*, 513 U.S. at 575. It "is a term of art," and the statutory definition includes "a partial circularity." *Id.* at 576 ("The term 'prospectus' means any prospectus . . . ." (quoting 15 U.S.C. § 77b(10)).

As explained *supra*, "Other Prospectuses/Other Proxy Solicitations"[29] refer to statements Defendants Williams, Richie, and Arqit Quantum/Centricus made in August 2021. (*See* Cons. Compl., Dkt. 43, ¶ 232.) The statements were made in two press releases and three investor presentations, each of which was "filed . . . with the SEC pursuant to Rule 425 under the Securities Act and deemed filed pursuant to Rule 14a-12 under the Exchange Act." (*Id.* ¶¶ 233, 237. *See also id.* ¶¶ 241, 245, 251.) Plaintiffs allege that each of these statements "was a prospectus under SEC Rules and the Securities Act." (*Id.* ¶¶ 233, 237, 241. *See also id.* ¶¶ 245, 251.) Defendants argue that because these statements "do not offer any security for sale or confirm the sale of any

[29] As previously noted, "[t]he Prospectus and the Proxy Statement are the same document[,] [and] [t]he Other Prospectuses and Other Proxy Solicitations are also the same documents." (Pls.' Mem., Dkt. 60, at 4 n.5.)

security," they are not prospectuses for purposes of Section 12(a)(2). (Defs.' Mem., Dkt. 59-1, at 10–11.)

The Court notes that neither party cited to any caselaw that speaks definitively to this question.[30] Further, Plaintiffs' Section 12(a)(2) claim turns only partially on statements made in the Other Prospectuses because Plaintiffs also allege that statements made in the Prospectus, which are attributable to Defendants Williams and Ritchie, as well as Arqit, violated Section 12(a)(2). (Cons. Compl., Dkt. 43, ¶¶ 280–81.) The Court concludes, then, that there is no reason at this stage to exclude the DSs that Plaintiffs characterize as "Other Prospectuses" for purposes of their Section 12(a)(2) claim.

c) Untrue Statements of Material Fact

Defendants also argue the Consolidated Complaint fails to sufficiently allege that the DSs that form the basis of the Section 12(a)(2) claim are materially false. Defendants make the same arguments about the alleged misstatements composing Plaintiffs' Section 12(a)(2) claim as they do about the ones making up Plaintiffs' Section 11 claim. (*See generally* Defs.' Mem., Dkt. 59-1, at 19–28.) DS7, discussed *supra*, was "made in the Arqit's Management's Discussion and Analysis of Financial Condition and Results of Operations section of the Prospectus," (Cons. Compl., Dkt. 43, ¶ 316), and accordingly forms part of the basis for Plaintiffs' Section 12(a)(2) claim, (*id.* ¶ 281). "Claims under [S]ections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements," *In re Morgan Stanley*, 592 F.3d at 359, and so the same standard for whether the DSs included are untrue statements of a material fact applies here. For the reasons explained in the Court's analysis of Plaintiffs' Section 11 claim, the Court finds that Plaintiffs have

[30] Nor, in its own research, did the Court find any.

adequately alleged that the relevant DSs contained materially misleading statements, and so Plaintiffs have adequately alleged a violation of Section 12(a)(2) of the Securities Act.

3. Defendant Ritchie

Defendants argue that "Plaintiffs' Section 12 claim against Ritchie is . . . barred by the statute of limitations because no Section 12 claim was asserted against him until the operative Complaint was filed in September 2023—long after the one-year statute of limitations expired on April 18, 2023." (Defs.' Mem., Dkt. 59-1, at 11.) An amended complaint relates back to the date of an original filing where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "[T]he central inquiry" to determine whether an amended pleading relates back "is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 86–87 (2d Cir. 1999) (internal quotation marks and citation omitted).

Plaintiffs argue that "[t]he initial timely Securities Act Complaint," i.e., the *Weeks* Complaint,[31] "(a) alleged Section 11 and 12(a)(2) claims, (b) named Ritchie as a defendant in the Section 11 claims, and (c) alleged that Ritchie made statements in Other Prospectuses on August 9 and [18],[32] 2021." (Pls.' Mem., Dkt. 60, at 10.) Thus, Plaintiff argues, even though "Ritchie

[31] As discussed, the *Weeks* Complaint was originally filed on April 14, 2023, in a separate action, No. 23-CV-2806 (PKC) (MMH), and was then consolidated by stipulation with this action on May 16, 2023.

[32] In their opposition, Plaintiffs state that the *Weeks* Complaint alleged Ritchie made statements in Other Prospectuses on August 9 and 11, 2021, (Pls.' Mem., Dkt. 60, at 10), but the *Weeks* Complaint alleges that Ritchie made statements on August 9 and 18, 2021, (No. 23-CV-2806 (PKC) (MMH), *Weeks* Compl., Dkt. 1, ¶ 50).

was first added as a Section 12(a)(2) Defendant in the [Consolidated] Complaint, those claims arise out of the conduct and transactions alleged in the initial Securities Act Complaint, and Ritchie was clearly on notice of them during the statute of limitations period." (*Id.*) In their reply, Defendants argue that the Section 12(a)(2) claims against Ritchie do not relate back because the *Weeks* Complaint "did not challenge any statements made by Ritchie on August 9 or 11, 2021, as Plaintiffs claim." (Defs.' Reply, Dkt. 61, at 14–15.)

While Defendants are correct that the relevant paragraphs of the *Weeks* Complaint recite verbatim statements made by Defendant Williams, not by Defendant Ritchie, these paragraphs also clearly name Ritchie as another presenter at the same presentations, (*see* No. 23-CV-2806 (PKC) (MMH), *Weeks* Compl., Dkt. 1, ¶¶ 49–50), which the Court finds sufficient to have put Ritchie on notice of the Section 12(a)(2) claim that was later raised in the Consolidated Complaint, *Stevelman*, 174 F.3d at 86–87 (finding that "central inquiry" in determining whether an amended pleading relates back "is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'" (citation omitted)). Thus, the Court finds that Plaintiffs' Section 12(a)(2) claim against Defendant Ritchie is not time-barred.

* * *

For the reasons explained above, the Court finds that Plaintiffs have adequately alleged a violation of Section 12(a)(2) of the Securities Act. Defendants' motion to dismiss Plaintiffs' Section 12(a)(2) claim is denied.

### C. Count Three: Violation of Section 15 of the Securities Act

Plaintiffs allege that the Securities Act Individual Defendants violated Section 15 of the Securities Act, which establishes control-person "liability for individuals or entities that 'control any person liable' under Section 11 or 12." *In re Morgan Stanley*, 592 F.3d at 358 (cleaned up)

(quoting 15 U.S.C. § 77o).[33] Defendants argue only that Plaintiffs' Section 15 claim "necessarily fail[s] because the Complaint fails to plead any underlying violation of Section 11 or 12(a)(2)." (Defs.' Mem., Dkt. 59-1, at 35.) Because the Court has already found that Plaintiffs have alleged violations of Sections 11 and 12(a)(2), it denies Defendants' motion to dismiss Plaintiffs' Section 15 claim.

## IV. Exchange Act Claims

### A. Count Four: Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

Plaintiffs and the Section 10(b) Class allege that the Section 10(b) Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5. (Cons. Compl., Dkt. 43, ¶ 428.) This claim is made up of DS1–49 and DS51–83.[34] (*Id.* ¶ 427 (incorporating by reference "each and every allegation" previously contained in the Consolidated Complaint, which includes DS1–83).) Defendants seek to dismiss this claim on the basis that the DSs were not misleading and that Plaintiffs failed to plead a strong inference of either scienter or loss causation. (Defs.' Mem., Dkt. 59-1, at 17, 29, 34.)

---

[33] "To establish Section 15 liability, a plaintiff must show: (1) a 'primary violation' of Section 11" or 12; "and (2) control of the primary violator by the defendants." *Handal v. Tenet Fintech Grp.*, No. 21-CV-6461 (PKC) (RER), 2023 WL 6214109, at *10 (E.D.N.Y. Sept. 25, 2023) (quoting *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009)). *See also Sec. Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). "Moreover, '[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.'" *Handal*, 2023 WL 6214109, at *10 (quoting *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)).

[34] As noted *supra*, Plaintiffs have withdrawn their claims related to DS50.

1. Section 10(b) and Rule 10b-5 Standard

Section 10(b) of the Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5 further explains that "any manipulative or deceptive devices" includes the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To survive a motion to dismiss under Section 10(b) of the Exchange Act, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.* ("*ATSI*"), 493 F.3d 87, 105 (2d Cir. 2007); *accord Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). As discussed, Plaintiffs' Exchange Act claims are subject to a heightened pleading standard under FRCP 9(b), such that a party must "state *with particularity* the circumstances constituting fraud . . . ." *ATSI*, 818 F.3d at 93 (emphasis added).

2. Application

a. Material Misstatements

In the context of a Section 10(b) claim, the Second Circuit has interpreted FRCP 9(b) to require that a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197–98 (2d Cir. 2013) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "The definition of materiality is the same for" Securities Act claims "as it is under [S]ection 10(b) of the Exchange Act: '[W]hether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Lematta*, 2022 WL 4637795, at *8 (quoting *In re Morgan Stanley*, 592 F.3d at 360).

Plaintiffs have specified the statements that they allege were fraudulent—the 87 challenged DSs—thereby satisfying the first prong. They have identified the speakers, too, and indicated when and where the statements were made. (*See generally* Cons. Compl., Dkt. 43; *see also* App. A, Dkt. 60-1 (Consolidated Complaint allegations recapitulated and organized).) Last, as the Court has already discussed, Plaintiffs have adequately alleged that the DSs were fraudulent. Thus, accepting all well-pled assertions of fact in the Amended Complaint as true, *see Iqbal*, 566 U.S. at 678, and drawing all reasonable inferences in favor of the non-moving party, *see Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir. 1995), the Court concludes that, under the standards of FRCP 9(b) and the PSLRA, Plaintiffs have adequately pled at this stage of the litigation that Defendants made false or misleading statements in support of their Exchange Act claims.

b. Scienter

FRCP 9(b) and the PSLRA require Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI*, 493 F.3d at 99 (alterations in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007)). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

A complaint "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. And where a complaint does not sufficiently allege that defendants had a motive to defraud the public, it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Plaintiffs first argue that they have "allege[d] a strong inference that [Section 10(b) Defendants] Williams, Pointon, and Arqit (through Williams, Pointon, and [non-party] Childe) were aware of, or recklessly disregarded, numerous facts contradicting their public statements," (Pls.' Mem., Dkt. 60, at 26), and then argue that the Section 10(b) Defendants had the motive to defraud. Because Plaintiffs do not clearly allege that the Section 10(b) Defendants had the opportunity to commit fraud, (*id.* at 31–32), the Court analyzes only whether Plaintiffs have adequately alleged that Defendants acted with conscious misbehavior or recklessness, *see ATSI*,

493 F.3d at 99 (holding that a complaint "may satisfy [scienter] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness").

"To prove intent based on a theory other than motive-and-opportunity, a securities fraud plaintiff must allege 'facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 77 (2d Cir. 2008) (summary order) (citation omitted). "Recklessness is defined as 'at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *ECA*, 553 F.3d at 198 (alterations in original) (quoting *Novak*, 216 F.3d at 308). Plaintiffs bear the burden of alleging conscious misbehavior or recklessness. *In re Meta Materials, Inc. Sec. Litig.*, No. 21-CV-7203 (CBA) (JRC), 2023 WL 6385563, at *23 (E.D.N.Y. Sept. 29, 2023). The plaintiffs' allegations must show both "(1) *specific* contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (alteration in original) (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. And "an inference at least as likely as competing inferences can, in some cases, warrant recovery." *Id.* at 324 n.5.

Defendants argue that "Plaintiffs' allegations fail to plead conscious misbehavior or recklessness" because (1) "Plaintiffs' allegations are based on sources that fail to meet the particularity requirements of the PSLRA and [FRCP] 9(b)"; (2) "Plaintiffs do not identify a single report, statement, or conversation showing how Defendants Williams or Pointon purportedly

'knew' that Arqit's technology was not viable"; and (3) "even if any CW had passed along any 'concerns' about Arqit's technology to Defendants Williams or Pointon (which is not alleged), this would not support an inference of scienter." (Defs.' Mem., Dkt. 59-1, at 30.) Plaintiffs counter that their allegations, when assessed "holistically," "allege a strong inference that Williams, Pointon, and Arqit (through Williams, Pointon, and [non-party] Childe) were aware of, or recklessly disregarded, numerous facts contradicting their public statements." (Pls.' Mem., Dkt. 60, at 26.) The Court has already found that Plaintiffs' sources meet the particularity requirements of the PSLRA, and so does not address this argument again here.

i. Communications from Britain's National Cyber Security Centre

To meet their burden, Plaintiffs first point to claims in the WSJ Article that British cybersecurity officials for Britain's National Cyber Security Centre ("NCSC") "questioned the viability of Arqit's proposed satellite-based encryption technology[35] in a high-level evaluation they shared directly with Arqit." (Pls.' Mem., Dkt. 60, at 26 (citing Cons. Compl., Dkt. 43, ¶¶ 116–22, 347).) The WSJ Article clarifies that this evaluation took place in the summer of 2020—about one year before the DSs were made. (WSJ Article, Dkt. 59-20, at ECF 3–4.)[36] Further, according to the article, when the evaluation took place, Defendant "Williams was apoplectic,"

[35] Defendants, on reply, argue that Plaintiffs speculate here by stating that the NCSC's questioning of "the viability of Arqit's proposed approach to encryption technology," (WSJ Article, Dkt. 59-20, at ECF 3), was in reference to Arqit's satellite-based technology, (Defs.' Reply, Dkt. 61, at 5). But the context of the rest of the WSJ Article seems to indicate that this "proposed" approach was a reference to satellite-based encryption technology. (*See* WSJ Article, Dkt. 59-20, at ECF 4 (referring to "satellite-based encryption systems like those Arqit is proposing to integrate into its current product in the next few years").)

[36] Although the NCSC had not reviewed Arqit's then-current technology as of the time of the article (April 2022), (WSJ Article, Dkt. 59-20, at ECF 2–3), that fact is irrelevant to determining Williams's scienter at the time he made statements about Arqit's encryption technology in 2021.

"denigrat[ing]" the NCSC's technical director "and the NCSC for weeks after the rebuke." (*Id.* at ECF 7.) The WSJ Article also stated that Arqit "[e]mployees who witnessed []Williams's reaction were concerned that the incident showed an inability to respond constructively to legitimate feedback, blunting the company's prospects," and that "Williams declined to comment." (*Id.*) "[I]n recent years," separately, the NCSC and the United States' National Security Agency "published separate assessments . . . warning against using satellite-based encryption systems like those Arqit [was] proposing to integrate into its [then-]current product." (*Id.* at ECF 4.)

Defendants generally argue that "even if Williams or Pointon was aware of the alleged views held by . . . the NCSC, the far more plausible inference is that Arqit's senior management considered those views and either disagreed with them or otherwise ascribed them appropriate weight as Arqit continued to innovate." (Defs.' Mem., Dkt. 59-1, at 33.) And Defendants do not specifically reply to Plaintiffs' argument that both Williams's reaction to the NCSC evaluation (which employees described as "legitimate feedback") as well as his declination to comment in the WSJ Article, demonstrate scienter.[37]

Giving due consideration to the opposing inferences the parties urge, the Court finds that the 2020 evaluation and Defendant Williams's reaction to it, as reported in the WSJ Article, support an inference that in 2021—when the majority of the DSs were made—Williams knew that Arqit's encryption technology was not viable, which in turn supports an inference of scienter. *See ATSI*, 493 F.3d at 99 ("For an inference of scienter to be strong, 'a reasonable person [must] deem

[37] While Defendants correctly note that cases that Plaintiffs rely on are factually distinguishable from the present case, (Defs.' Reply, Dkt. 61, at 10–11 (first citing *Sec. & Exch. Comm'n v. DiMaria*, 207 F. Supp. 3d 343, 348–49 (S.D.N.Y. 2016); and then citing *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 722, 733 (S.D.N.Y. 2015))), this does not affect the Court's determination of whether it can be reasonably inferred that Defendant Williams knew of the significant flaws in Arqit's technology at the time he made the statements in the summer of 2021.

[it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" (alterations in original) (quoting *Tellabs*, 551 U.S. at 324)).

But the WSJ Article does not mention Defendant Pointon—who, in any event, did not work for Arqit in 2020, (Cons. Compl., Dkt. 43, ¶ 32)—and so the Court does not find that Plaintiffs' allegations relating to the WSJ Article support an inference of scienter as to Pointon.

ii. Internal Company Meetings with CW-2

Plaintiffs next argue that Defendant Williams's scienter is demonstrated by (a) a presentation that CW-2 gave at a July 2020[38] off-site meeting, and (b) monthly progress meetings that CW-2 had with Williams and non-party Childe[39] (who, again, reported to Williams), during which CW-2 raised concerns about Arqit's encryption technology. (Pls.' Mem., Dkt. 60, at 27–28.) Defendants counter that Williams did not attend the July 2020 presentation, and that Plaintiffs cannot rely on Childe's attendance at that presentation to infer Williams's knowledge of the concerns allegedly raised at that presentation, especially when Childe only attended part of it. (Defs.' Reply, Dkt. 61, at 11 & n.15.) Defendants also argue that Williams's presence at the monthly meetings does not support an inference of scienter because those meetings concerned a project "irrelevant to Arqit's QuantumCloud technology." (*Id.* at 11.)

Plaintiffs, however, further allege that after the July 2020 presentation, non-party Childe told CW-2 "not [to] come to the next day of the offsite meeting," and that "[a] few days after CW-2's presentation, CW-2's regular progress meetings with [Defendant] Williams and Childe were

---

[38] The Court notes that Defendant Pointon did not join Arqit until March 2021, and so would not have been present for or directly aware of the presentation CW-2 gave in July 2020. (Cons. Compl., Dkt. 43, ¶ 32.)

[39] Childe was the Arqit Limited CIO until the Merger. (Cons. Compl., Dkt. 43, ¶ 49.) Alongside Defendant Williams, Childe was "listed on Arqit's website as a co-founder of the Company and on Arqit's ARQ19 patent filing as an inventor." (*Id.* ¶ 391.)

cancelled indefinitely, and CW-2 was instructed to begin handing over projects to a newly-established development team." (Cons. Compl., Dkt. 43, ¶ 130.) According to Plaintiffs, "CW-2 later came to learn" that "Williams was unhappy and disappointed with CW-2." [40] (*Id.*)

Again, giving due consideration to the opposing inferences the parties urge, the Court finds it reasonable to infer that Defendant Williams had at least some knowledge—possibly communicated by non-party Childe—about the contents of CW-2's July 2020 presentation, since their regular meetings were cancelled just a few days after the presentation and Williams was reportedly "unhappy and disappointed with CW-2." (*Id.* ¶ 130.) Further, contrary to Defendants' claim that CW-2's monthly meeting concerned a project "irrelevant to Arqit's QuantumCloud technology," (Defs.' Reply, Dkt. 61, at 11), Plaintiffs clearly allege that the code on which CW-2 was working "would later be used to make Arqit's QuantumCloud software," and that CW-2 had "develop[ed] a modified version of [a type of] code to be used as the software basis for the 'Quantum Cloud' blockchain prototype," (Cons. Compl., Dkt. 43, ¶¶ 101, 103, 106–08). These allegations buttress the inference that Williams's reaction to CW-2 after his July 2020 presentation was due, at least in part, to CW-2 raising concerns about Arqit's QuantumCloud technology.

Defendants also raise their stock response that "the far more plausible inference" of Defendant Williams's conduct "is that Arqit's senior management considered those views and either disagreed with them or otherwise ascribed them appropriate weight as Arqit continued to innovate." (Defs.' Mem., Dkt. 59-1, at 33.) However, in light of all of the surrounding

[40] Though Plaintiffs in their opposition state that "CW-2 was told that Williams was unhappy with him for raising the cost issues" at the July 2020 presentation, (Pls.' Mem., Dkt. 60, at 27 (citing Cons. Compl., Dkt. 43, ¶¶ 130, 358)), the pleadings to which they cite state only that CW-2 was told that Defendant Williams was unhappy with him, and do not specify a reason, (Cons. Compl., Dkt. 43, ¶¶ 130, 358). Still, because this is a motion to dismiss, the Court cannot consider the additional facts Defendants assert about the presentation and monthly meetings and must construe the Consolidated Complaint in the light most favorable to Plaintiffs.

circumstances, including the fact that the QuantumCloud project was never launched, the Court finds that the inference that Defendant Williams was aware of CW-2's critiques of Arqit's technology, knew that the critiques were correct, and then acted with scienter when making the DSs, is "at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324.

iii. CW-3's Public Critiques

Next, Plaintiffs point to CW-3's August 25, 2021[41] presentation at the QCrypt industry conference, during which CW-3 "warned . . . that Arqit's ARQ19 protocol for quantum key distribution via satellite was not viable, based on CW-3's review of Arqit's patent." (Pls.' Mem., Dkt. 60, at 28 (citing Cons. Compl., Dkt. 43, ¶¶ 52, 132–43).) CW-3's presentation was 13 days before Arqit Quantum went public on the NASDAQ. (Cons. Compl., Dkt. 43, ¶ 52.) Further, Plaintiffs allege that prior to this presentation, CW-3 had reviewed Arqit's ARQ19 patent for satellite QKD and had "immediately recognized irregularities" with it, including that Arqit had not followed the "standard practice[42] that patent owners publish their scientific discoveries in a scientific journal and encourage peer review and discussion." (*Id.* ¶ 133.) As later reported in the WSJ Article, "CW-3 believed this was suspicious because it was to Arqit's benefit to be open about its findings; only by successfully defending critiques and attacks would the scientific community, investors, and customers believe the Company's purported technological breakthrough was robust, correct, and quantum safe." (*Id.*) In other words, CW-3 stated, "Arqit's behavior was very strange." (*Id.*)

---

[41] By this point, Defendant Pointon had joined Arqit as CFO. (Cons. Compl., Dkt. 43, ¶ 32.)

[42] As a reminder, CW-1 and CW-2 corroborated that this is "standard practice." (Cons. Compl., Dkt. 43, ¶ 133.)

While Plaintiffs do not allege that any Defendant was present at the conference or listened to CW-3's presentation,[43] they do allege that "[o]n August 25, 2021, immediately after the QCrypt Conference at which CW-3 presented, the Dentons law firm, on behalf of Arqit, sent CW-3 a letter claiming CW-3's observations were incorrect and represented a misunderstanding of Arqit's technology" and threatened to sue CW-3 for defamation. (*Id.* ¶ 353.) Plaintiffs allege that "[t]here is a strong inference that no such letter would [have] be[en] sent without knowledge and approval by the most senior officers of Arqit—[Defendants] Williams and Pointon." (*Id.* ¶ 354.) And yet, 13 days later, Arqit debuted as a publicly traded company, (*id.* ¶ 144), and in the months that followed, proceeded to make many of the DSs at issue here.[44]

In response to Plaintiffs' allegations regarding CW-3, Defendants point to the same alternative inference of Defendants' conduct in response to CW-3, which "is that Arqit's senior

---

[43] Defendants do not dispute that Arqit was aware, at the relevant time, of CW-3's presentation. (*See, e.g.*, Defs.' Mem., Dkt. 59-1, at 16–17, 33; Defs.' Reply, Dkt. 61, at 8, 11–12.)

[44] CW-3's presentation took place in late August 2021, and so could not support an inference of scienter for DSs that preceded the presentation, such as those made in the Registration Statement as amended on July 29, 2021, which the SEC declared to be effective on July 30, 2021. (Cons. Compl., Dkt. 43, ¶¶ 144, 178); *see Glaser*, 772 F. Supp. 2d at 588 (allegations must show contradictory information was available to defendants at the same time misleading statements made). But many DSs were made after CW-3's presentation, including, but not limited to, those "incorporated by reference into, and restated in, the September 2021 20-F," which Arqit filed on September 10, 2021, and similar DSs made in the December 2021 20-F, which Arqit filed on December 16, 2021. (Cons. Compl., Dkt. 43, ¶¶ 311–17, 327–31.) Accordingly, CW-3's August 2021 presentation included allegedly contradictory information that was available to Defendants at the time many of the DSs were made.

Plaintiffs also allege that the CW-3 Article, which CW-3 sent to Arqit sometime after CW-3 submitted it to the journal on May 2, 2022, and before its publication on September 9, 2022, (Cons. Compl., Dkt. 43, ¶ 147), also helps to "create a strong inference" of scienter for Defendants Williams and Pointon, (Pls.' Mem., Dkt. 60, at 29). But by the Court's count, only DS83—made during a May 12, 2022, conference call—occurred after 2021, (*see generally* App. A, Dkt. 60-1), and so the CW-3 Article cannot support an inference of scienter for any other DS, *Glaser*, 772 F. Supp. 2d at 588.

management considered [CW-3]'s views and either disagreed with them or otherwise ascribed them appropriate weight as Arqit continued to innovate." (Defs.' Mem., Dkt. 59-1, at 33.) The Court again does not find Defendants' arguments here persuasive, and instead finds that the inference that Defendants Williams and Pointon were aware of CW-3's critiques of Arqit's technology, knew that those critiques were accurate, and then acted with scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

*        *        *

In sum, the Court finds that Plaintiffs have alleged sufficient facts to support an inference that the Section 10(b) Defendants knew that at least some of the statements they made in 2021 about Arqit's encryption technology were false. Plaintiffs have therefore sufficiently alleged conscious misbehavior or recklessness as to the Section 10(b) Defendants, i.e., Arqit, Williams, and Pointon. *In re Meta Materials*, 2023 WL 6385563, at *23.[45]

c. <u>Reliance</u>

As Plaintiffs note, Defendants do not challenge whether Plaintiffs relied on the DSs. (Pls.' Mem., Dkt. 60, at 6 n.9.) Defendants do not refute this, (*see generally* Defs.' Reply, Dkt. 61), and so the Court does not analyze this issue here.

d. <u>Causation</u>

"'Loss causation' . . . is virtually synonymous with 'traditional proximate cause' and requires a showing that the 'allegedly wrongful conduct,' as opposed to other intervening events,

---

[45] Because of this finding, the Court need not, and does not, address the other allegations Plaintiffs rely on to support the inference of scienter, (*see* Pls.' Mem., Dkt. 60, at 29–31), or Defendants' other arguments against scienter, (*see* Defs.' Mem., Dkt. 59-1, at 31–33).

'caused the economic harm' that ultimately resulted." *In re Arcimoto Inc. Sec. Litig.*, No. 21-CV-2143 (PKC), 2022 WL 17851834, at *6 (E.D.N.Y. Dec. 22, 2022) (quoting *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 230 (E.D.N.Y. 2014)). Loss causation "may be shown by allegations that 'the market reacted negatively to a corrective disclosure of the fraud' after something or someone 'reveal[ed] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.'" *Id.* (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original). Loss causation is typically "an issue to be determined by the trier of fact on a fully developed record," *id.* (quoting *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011)), as is the determination of whether statements are "corrective disclosures," *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013).

Plaintiffs allege that the WSJ Article and Arqit's December 14, 2022 disclosures—that it was moving away from satellite technology and cooperating with an SEC investigation—both caused losses. After both were released, Arqit's share and warrant prices declined, and Arqit received negative news coverage, allegedly causing losses to Plaintiffs. (Cons. Compl., Dkt. 43, ¶¶ 400–19.) Defendants argue, first, that "the WSJ Article does not support loss causation for the same reason it does not support falsity," and, second, that "Arqit's December 14, 2022 disclosures . . . do not show loss causation because they say nothing about the truth of any previous statements." (Defs.' Mem., Dkt. 59-1, at 34.) Defendants also argue that "Arqit's announcement

that it was 'cooperating with an SEC investigation' has no nexus to any challenged statement." (*Id.* at 35 (quoting Cons. Compl., Dkt. 43, ¶ 201).) The Court disagrees with Defendants.

First, the Court has already found that the WSJ Article at least in part supports falsity, and so does not find Defendants' parallel argument about loss causation compelling for the same reasons. For example, as Plaintiffs argue, the WSJ Article "revealed to the market, among other things, that contrary to Defendants' statements, QuantumCloud was not 'secure against current and future forms of cyber attack.'" (Pls.' Mem., Dkt. 60, at 33.) Since Defendants had, prior to the release of the WSJ Article, repeatedly claimed that Arqit's technology (1) "makes"—in the present tense—"the communications links of any networked device secure against current and future forms of cyber attack," (*see* Cons. Compl., Dkt 43 ¶¶ 213, 329 (DSs 1, 2, 7, 57, 58, 63)), and (2) "creates"—also the present tense—"symmetric encryption keys, which is a cyber-encryption technology that is secure against all forms of attack[,] including by quantum computers," (*see id.* ¶¶ 213, 329, 455 (DSs 5, 61, 84)), the WSJ Article's revelation that Arqit's technology was not, in fact, protective against "current and future forms of cyber attack" was plainly a "then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint," *In re Arcimoto Inc. Sec. Litig.*, 2022 WL 17851834, at *6 (quoting *in re Omnicom Grp.*, 597 F.3d at 511).

Second, the December 14, 2022, disclosures state that Arqit was moving away from its quantum satellite technology, characterizing it as a "significant change in its technology strategy." (Cons. Compl., Dkt. 43, ¶¶ 404–05 (emphasis omitted).) Industry and financial press that followed quoted this "significant change" admission, and pointed out that this "had hurt Arqit Quantum's ability to secure key customer contracts premised on said technology." (*Id.* ¶¶ 409–10.) Defendants argue that these disclosures "do not show loss causation because they say nothing

about the truth of any previous statements," (Defs.' Mem., Dkt. 59-1, at 34), but this is an overly narrow application of the relevant standard. It is not necessary that the falsity of Defendants' prior statements be expressly revealed by a subsequent disclosure. Rather, the falsity of Defendants' 2021 statements about QuantumCloud's existence and viability was implicitly revealed by the December 2022 disclosures that Arqit was moving away from its quantum satellite technology, especially in light of DSs that specifically conveyed that Arqit's satellite technology was part of its strategy and plans as a company. (*See, e.g.*, Cons. Compl., Dkt 43, ¶ 217; *id.* (DS21: "Arqit [Limited]'s quantum satellite technology solves all previously known problems of quantum key distribution" (alteration in original) (emphasis omitted)); *id.* ¶ 306 (DS47: "Arqit's invented some new technology which is called quantum encryption," which works "by combining quantum delivery of information from satellites to data centers . . . .").) *See In re Facebook*, 986 F. Supp. 2d at 523 ("noting that loss causation may exist when truth about the company's underlying condition, when revealed, causes the "economic loss" (cleaned up) (quoting *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010))).

Thus, the Court finds that Plaintiffs have adequately alleged loss causation.

* * *

For the reasons explained above, the Court finds that Plaintiffs have adequately alleged a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Defendants' motion to dismiss Plaintiffs' Section 10(b) claim is denied.

**B. Count Five: Violations of Section 20(a) of the Exchange Act**

"Any claim for 'control person' liability under [Section] 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010) (citing 15 U.S.C. § 78t(a)). Further, "a plaintiff must show . . . 'that the defendant was, in some meaningful sense, a culpable participant in

the . . . fraud." *Lematta*, 2022 WL 4637795, at *15 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (summary order)). Defendants argue that Plaintiffs' Section 20(a) claim "necessarily fail[s] because the [Consolidated] Complaint fails to plead any underlying violation of" Section 10(b), and "because Plaintiffs do not allege any individual Defendant was a 'culpable participant' in the alleged fraud." (Defs.' Mem., Dkt. 59-1, at 35 (quoting *In re Arcimoto*, 2022 WL 17851834, at *8).)

As described above, Plaintiffs have sufficiently pled primary violations of Section 10(b). Further, Plaintiffs have alleged that the Section 10(b) Defendants were culpable participants because, for example, Defendants Williams and Pointon signed "certifications pursuant to the Sarbanes-Oxley Act of 2002" for the December 2021 20-F, which contained many of the DSs. (Cons. Compl., Dkt. 43, ¶¶ 327, 329, 331, 333, 335, 338, 340.) Thus, the Court finds that Plaintiffs have adequately alleged violations of Section 20(a) of the Exchange Act. Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is denied.

### C. Count Six: Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

Plaintiffs allege that the Section 14(a) Defendants are liable under Section 14(a) of the Exchange Act and SEC Rule 14a-9. (Cons. Compl., Dkt. 43, ¶ 466.) Section 14(a) of the Exchange Act and SEC Rule 14a-9 bar the distribution of proxy statements that are "false or misleading with respect to any material fact." 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9(a). "Plaintiff[s] 'must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link' in the accomplishment of the transaction.'" *Fisher v. Kana*, 467 F. Supp. 2d 275, 281 (E.D.N.Y. 2006) (quoting *Bond Opportunity Fund v. Unilab Corp.*, No. 99-CV-11074 (JSM), 2003 WL 21058251, at *3

(S.D.N.Y. May 9, 2003)). "Securities registered by a foreign private issuer," subject to some exceptions, are not subject to Section 14(a) liability. 17 C.F.R. §§ 240.3a12-3(b), 240.3b-4(c). Pursuant to one of those exceptions, foreign private issuers *are* subject to liability under Section 14(a) if "[m]ore than 50 percent of the [foreign issuer's] assets are located in the United States." *Id.* § 240.3b-4(c)(2)(ii).

Defendants argue that Arqit—just one of the Section 14(a) Defendants—is a foreign private issuer and thus exempt from Section 14(a) liability.[46] (Defs.' Mem., Dkt. 59-1, at 28.) Plaintiffs do not dispute that Arqit is a foreign private issuer, and instead counter that "Arqit assumed Centricus'[s] Section 14(a) liability as successor to Centricus," which is "a domestic issuer" (and thus not exempt from Section 14(a) liability), and that Centricus's shares were registered pursuant to an SEC Form that "is for domestic issuers."[47] (Pls.' Mem., Dkt. 60, at 11.) Further, Plaintiffs argue that the Proxy Statement solicited votes from "shareholders in Centricus, a domestic issuer" so the foreign private issuer exemption does not apply. (Pls.' Mem., Dkt. 60, at 11 (citing *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 394 (D. Del. 2005), *aff'd*, *Tracinda II* 502 F.3d 212 (3d Cir. 2007)).) In their reply, Defendants do not dispute that Arqit is liable as Centricus's successor, instead protesting that "this [is a] new position" because Plaintiffs did not raise it in their letter responding to Defendants' pre-motion conference request,

---

[46] Because Defendants do not argue that the other Section 14(a) Defendants (Williams, Pointon, Lefebvre, Ritchie, Jamieson, and Wilson, (Cons. Compl., Dkt. 43, ¶¶ 41–42)) are not subject to Section 14(a) liability, the Court notes that Plaintiffs' Section 14(a) claims extend to them.

[47] Curiously, despite claiming that Centricus is a *domestic* issuer (and thus not a foreign issuer exempt from Section 14(a) liability), Plaintiffs go on to argue that because Centricus's only assets were located in the United States, it is subject to Section 14(a) liability due to the exception that allows liability for *foreign* issuers when "[m]ore than 50 percent of the [foreign issuer's] assets are located in the United States." (Pls.' Mem., Dkt. 60, at 11); 17 C.F.R. § 240.3b4(c)(2)(ii).

and arguing that only five DSs, DS84–88, were made by Centricus.[48] (Defs.' Reply, Dkt. 61, at 15 & n.24 (citing Pls.' Pre-Mot. Letter, Dkt. 50, at 2).) Defendants also argue in their reply that the foreign private issuer exemption applies even when a foreign issuer merges with a domestic company and even when the alleged misstatements were in the proxy statement of the domestic company. (Defs.' Reply, Dkt. 61, at 15 (citing *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 171 (S.D.N.Y. 2003)).)

As a preliminary matter, the Court agrees with Plaintiffs they have adequately alleged that Arqit is liable as Centricus's successor. (Cons. Compl., Dkt. 43, ¶ 29 ("Through the Merger and the acquisition of Arqit Limited, Arqit Quantum is the successor to Centricus and Arqit Limited.").) And even if only five DSs are attributable to Centricus, the Court has already found that at least one of those DSs, DS84, supports Plaintiffs' allegations of Exchange Act violations. (*See supra*, Discussion § IV.A.2.d. (discussing, *inter alia*, DS84 and determining that Plaintiffs have adequately alleged that it violated Exchange Act Section 10(b)).) Last, neither party is bound in their briefing to arguments made in their pre-motion conference letters. Thus, at least as to some of the DSs, Plaintiffs have adequately alleged that Arqit may be held liable under Section 14(a) as Centricus's successor.

Second, even if Arqit could not be found liable as Centricus's successor, the Court agrees that the foreign private issuer exemption to Section 14(a) liability "does not apply to the solicitation of shareholders of a domestic company." *Tracinda*, 364 F. Supp. 2d at 394. "By its express language, the exemption" for foreign private issuers "under Rule 3a12-3(b) pertains to securities registered *by* a foreign private issuer." *Id.* (emphasis in original); *see also*

[48] These DSs were made in a section of the Proxy Statement where "Centricus gave reasons as to why Centricus stockholders should vote to approve the Merger." (Cons. Compl., Dkt. 43, ¶ 455.)

17 C.F.R. § 240.3a12-3(b) ("Securities *registered by* a foreign private issuer . . . shall be exempt from" Section 14(a) (emphasis added)). If the Proxy Statement was a solicitation targeting Arqit shareholders, Arqit would be exempt from Section 14(a) liability as a foreign private issuer that had registered those Arqit securities. But here, the Proxy Statement "was aimed at inducing [Centricus] shareholders to vote their shares of [Centricus], a [domestic and] non-exempt registered security, in favor of the Merger." *Tracinda*, 364 F. Supp. 2d at 394. Centricus securities were *not* securities "registered by a foreign private issuer" because they were registered by a domestic issuer, Centricus, and so the foreign private issuer exemption to Section 14(a) does not apply here. *Id.* While Defendants argue that Plaintiffs "[did] not attempt to distinguish the in-circuit precedent in *Vivendi*," (Defs.' Reply, Dkt. 61, at 15), the *Vivendi* court "did not analyze this question in detail," *Tracinda*, 364 F. Supp. 2d at 394. Further, the plaintiffs in *Vivendi* did not appear to make a similar argument to Plaintiffs here, instead "suggest[ing] that the falsity of the proxy statement should suffice to impose liability under" Section 14(a), even though the proxy statement was issued by a foreign private issuer.[49] *Vivendi*, 381 F. Supp. 2d at 171.

* * *

Defendants also argue that Plaintiffs have not adequately pled loss causation for their Section 14(a) claim. (Defs.' Mem., Dkt. 59-1, at 34–35.) The Court finds that Plaintiffs have adequately pled loss causation for their Section 14(a) claim for the same reason the Court found

---

[49] While Defendants may be correct that few, if any, other courts have applied similar reasoning or reached the same holding as the District of Delaware did in *Tracinda*, (Defs.' Reply, Dkt. 61, 15 n.25), the Court finds the reasoning in *Tracinda*—which the Third Circuit affirmed—straightforward and appropriate here. Although the Third Circuit did not discuss the district court's analysis of the inapplicability of the foreign private issuer exception, adopting the district court's characterization of the relevant "Proxy/Prospectus . . . [as] solicit[ing] [the domestic company's] shareholder approval for the proposed merger," *Tracinda II*, 502 F.3d at 230, the panel implicitly accepted the district court's analysis.

Plaintiffs had done so for their Section 10(b) claim. Defendants' motion to dismiss Plaintiffs' Section 14(a) claim is denied.

### D. Count Seven: Violations of Section 20(a) of the Exchange Act

The Court finds that Plaintiffs have adequately alleged violations of Section 20(a) related to their Section 14(a) claim for the same reasons the Court finds that Plaintiffs have adequately alleged violations of Section 20(a) related to their Section 10(b) claim. Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is denied.

## CONCLUSION

For the reasons explained above, Defendant's motion to dismiss is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 28, 2025
Brooklyn, New York